Steven M. Wells
Steven M. Wells, P.C.
431 W. 7th Ave.
Ste. 107
Anchorage, AK  99501
(907)279-3557
(907)279-3558 fax
steve@alaskalegaldefense.com

Attorney for Defendant

In the United States District Court
District of Alaska

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Dmitry Kudryn,<br><br>Defendant. | Case No. 3:18-cr-0056-SLG<br><br>Sentencing Memorandum |

Dmitry Kudryn, through his counsel of record, hereby files the attached sentencing memorandum.

1. Introduction

Dmitry Kudryn faces sentencing for conspiracy to commit wire fraud related to various sales of furniture on Craigslist. This would normally be a straight forward matter

to evaluate the Sentencing Guidelines, consider losses and victims, and review §3553(a) factors before determining a sentence.

This case, though, has two complicating factors. First, Mr. Kudryn was investigated for sales of 'gray-market' iPads, iPads that were sold as being in 'new condition' when they were alleged to have been refurbished. That conduct involved the sales of tens of millions of dollars worth of iPads.

Secondly, not everyone who purchased furniture from Mr. Kudryn off Craigslist considers themselves a victim. Some persons, as evidenced by the attached affidavits, understand the *caveat emptor* nature of Craigslist and have found their purchases quite satisfactory.

The issue in determining an appropriate sentence thus involves determining to what extent these two factors affect Mr. Kudryn's sentence.

## 2. Guideline Calculation

The pre-sentence report calculates Mr. Kudryn's Guideline level as a total offense level of 21 with a criminal history category of I. Mr. Kudryn filed a timely objection to this calculation, objecting to the inclusion of paragraphs 5-21 in the pre-sentence report because they spend an inordinate amount of time focusing upon conduct that is not the count of conviction. Mr. Kudryn further objected because, contrary to the pre-sentence report writer's assertions, the iPad conduct was not the same course of conduct as the Craigslist furniture scheme.

The pre-sentence report writer brushed off Mr. Kudryn's objections, arguing that Mr. Kudryn was dishonest about the furniture sold on Craigslist, which was sold through international commerce and Mr. Kudryn was dishonest about iPad sales, which were also sold through international commerce so they are part of the same scheme.

The pre-sentence report writer's position is clearly shown in paragraph 45, in which she describes the steps Mr. Kudryn went through to sell his furniture. Even though Mr. Kudryn has been indicted and pled to counts that only involve the furniture, the pre-

sentence report writer describes how Mr. Kudryn set up numerous companies to deal with Amazon, how he had to purchase boxes that looked like boxes from Apple Computer, how he used various identities to sell products through Amazon, and what he did with proceeds from Amazon sales.

It is undisputed that the sales in this case were done through Craigslist, not Amazon. The sales for the count of conviction did not involve any of the companies Mr. Kudryn used to do business with Amazon. The iPad sales were done throughout Europe and other parts of the world. The furniture sales were done by Mr. Kudryn in Alaska. These were two separate businesses and the pre-sentence report writer's conflation of the two, and inclusion of paragraphs 5 through 21 in the pre-sentence report, are wildly excessive.

In sum, Mr. Kudryn objected to: the loss calculation; the enhancement for 10 or more victims; the sophisticated means enhancement; and the unlawful use of another's identification to further this scheme. Mr. Kudryn continues with those objections.

2.1 Use of Another's Name

In paragraph 46, the pre-sentence report writer urges that Mr. Kudryn face a two level enhancement for the use of Mr. Omelchuk's identity. Mr. Omelchuk was an acquaintance of Mr. Kudryn who worked for him over ten years ago. At that time, upon information and belief, Amazon "capped" how much business it would do with individuals in its Amazon Associates program. While Mr. Omelchuk was working with Mr. Kudryn, Mr. Omelchuk set up an Amazon account that he used. When Mr. Omelchuk left the United States, Mr. Kudryn continued to use that account with Mr. Omelchuk's permission so he could grow his business with Amazon.

The typical use of another's name works to the detriment of the person whose name is used. For example, John gets a credit card in Bill's name so John can rack up purchases that Bill has to pay for. John has used Bill's name to Bill's detriment because Bill now owes money for something he never wanted and he suffers the marks on his credit while this is worked out.

Here, Mr. Omelchuk agreed to create an Amazon account while working with Mr. Kudryn. He agreed Mr. Kudryn could continue to use it because the point was not to saddle Mr. Omelchuk with debts for Mr. Kudryn's benefit. Rather, the point was that Mr. Kudryn could do more business and get around a rule that Amazon had arbitrarily imposed that would limit the work done by Amazon Associates.

For purposes of evaluating this enhancement, then, there are two relevant factors. First, the use of Mr. Omelchuk's was never associated with furniture sold on Craigslist. Indeed, the use of Mr. Omelchuk's name and account was stopped several years ago, before the furniture sales started.

Second, the use of Mr. Omelchuk's name was not to deprive anyone of anything, nor to gain a legal benefit but to expand Mr. Kudryn's business. Consider this example: Lowe's has a sale on snow blowers. John wants to go into business running a snow clearing service. Lowe's sale will greatly benefit his business but Lowe's limits the sale to one per customer. John wants two snow blowers because he knows he can make more money if he has two people working instead of one. So John gives the money for a second snow blower to Al, who will work for him. Al takes John's money and buys the snow blower and then gives it to John.

Lowe's reduced prices for snow blowers were a contractual offer but as a retailer, they limited that offer to one snow blower per person. John used Al and Al's identity to purchase a snow blower contrary to the offer that Lowe's made. If Lowe's knew Al was purchasing for John, Lowe's could have refused the sale. Lowe's remedy, then, is a civil remedy against John and Al but such transactions, while exceedingly common in American business, generally do not result in criminal sanctions. If they did, America's prison population would dwarf those who were outside prison.

The use of Mr. Omelchuk's name, then, should not enhance his guideline level.

2.2 THE USE OF SOPHISTICATED MEANS

The pre-sentence report urges this court to increase Mr. Kudryn's guideline level by two points for use of sophisticated means. Mr. Kudryn objects. Again, Mr. Kudryn's primary objection is that the pre-sentence report writer is conflating the iPad sales with the furniture sales. The paragraph that describes the sophisticated means lists the many businesses and organizations formed (which were done because of Amazon's own business limits as described above). The pre-sentence report describes Mr. Kudryn's purchase of Apple and Blackberry boxes. The report describes Mr. Kudryn's use of Mr. Omelchuk's identity. But none of those have anything to do with the furniture sales.

Mr. Kudryn's furniture sales were actually straight forward. Mr. Kudryn and his brother run a business entitled 'Crave'. Crave sells electronic accessories, such as iPhone/iPad cords, external charging batteries, decorative cases and the like. Crave sells these products around the world. Crave arranges to purchase these products from Chinese manufacturers so they can be sold around the world.

Given shipping and import fees and duties, Crave found it was easiest and cheapest to rent entire container vans for shipping. But the business did not purchase enough product to fill up a container fan. Container vans are a frequent sight in Alaska. Consider how many iPhone charging cords it would take to fill up a container van. So the company had extra space in its container vans.

Mr. Kudryn realized he could contract with a Chinese manufacturer to make furniture sets that would occupy the remaining room in his container vans and he could sell them below the market price for similar furniture sets to cover his shipping expenses. These furniture sets are the same that are sold throughout this country. Similar sets are on sale at Bailey's in Anchorage, as evidenced by the comparison of various furniture sets attached to this sentencing memorandum. Mr. Kudryn purchased these furniture sets, loaded them into the container vans and then sold them on Craigslist. Some he sold direct to customers and some he sold to family members in Washington State and Hawaii. Those family members presumably sold their sets to others.

Mr. Kudryn's furniture sales, then, were him purchasing furniture directly from the factory, using existing space in cargo container vans for shipment, and then selling them on Craigslist to defray some shipping costs.

Mr. Kudryn admits he told some customers that the furniture was from Italy and that he put in his ads that the furniture was an extra that he did not need, neither of which was true. Nonetheless, there was no sophisticated means. Anybody could do this, although Mr. Kudryn was uniquely positioned to do this because his business already had empty space in the container vans. This court should deny the enhancement for sophisticated means because it does not apply and because the pre-sentence report inextricably combines the means for the iPad sales with the means for the furniture sales when those are two completely different businesses and business models.

2.3 MORE THAN TEN VICTIMS

The pre-sentence report writer urges this court to enhance Mr. Kudryn's sentence by two levels because there are more than ten victims. As proof, she includes statements from three people who claim to be victims. One victim says he had to pay $250 to repair the furniture (paragraph 38) while another said that they only became aware of his fraud when reading in the newspaper (paragraph 39) and now wants a full refund. A third says the furniture was cheaply made and is generally dis-satisfied (paragraph 39(a)).

The pre-sentence report writer starts with the presumption that everyone who purchased a furniture set is a victim (response of U.S.P.O. to defense objection, Docket 80, p. 35). Mr. Kudryn has attached several affidavits from purchasers of the furniture who do not believe they are a victim.

This fact separates this case from a typical fraud case. In a typical fraud case, people know they have been ripped off. Money is missing from their bank. Unexplained charges appear on their credit card. Property they thought was worth $325,000 is only worth $225,000.

Here, though, the furniture was pretty much the same as if the purchasers got it from Bailey's or Ashley HomeStore or Pier 1 or some other furniture store. Upon information and belief, Duoxieyi Sofa Company makes furniture for several brands that are sold in the

United States. And those pieces of furniture are sold in Anchorage for more than what people paid for them to Mr. Kudryn.

At what point, then, does *caveat emptor* become fraud? Would any purchaser of these furniture sets have declined purchase if told the truth, that Mr. Kudryn had these sets made in China from Italian leather to sell to people in an effort to defray shipping expenses? Or would any of them have said that the prices in Anchorage furniture stores are three or four thousand dollars and Mr. Kudryn's couches, being cheaper, are the better bargain? After all, the purchasers of the furniture wanted leather furniture sets and they got leather furniture sets. There is simply no way to know in these circumstances if disclosure of all of the circumstances would have dissuaded any purchaser from making their purchase.

This is not a case in which someone can say that because of Mr. Kudryn's actions, they are facing bills that they did not agree to. Instead, some of the purchasers of Mr. Kudryn's were fraudulently induced to purchase furniture when if they bought the same furniture with full disclosure about its origin from a furniture store, they would have paid more money. Mr. Kudryn has attached numerous affidavits from some of his purchasers who knew exactly what they were getting and are quite happy with their purchases. If they knew the nature of Craigslist sales and are happy with their purchases, how can they be considered victims?

Given that some people were clearly aware of what they were purchasing or the nature of the Craigslist marketplace, it is impossible to say that every single purchaser was a victim. Further, Mr. Kudryn sold many of his furniture sets to family members in Washington State and Hawaii. Those family members then sold the sets of furniture they received. It is thus impossible to say exactly how many victims there are of Mr. Kudryn's furniture sales. As of the filing of the final pre-sentence report, only three victims have come forward and demanded restitution as of the filing of the pre-sentence report. Since only three have come forward to claim their dissatisfaction with the furniture they purchased, the government has not met its burden to establish that every single purchaser is a victim and therefor the two level enhancement for more than ten victims should apply.

## 2.4 Intended Loss Amount

The pre-sentence report writer likewise errs in calculating loss amount. Mr. Kudryn agreed that he purchased roughly $300,000 worth of furniture and the pre-sentence report writer converts this to the intended loss amount without recognizing that numerous furniture sets were sent to family for sale. Those family members paid Mr. Kudryn's wholesale price to cover his expenses.

The pre-sentence report writer keeps noting that Mr. Kudryn placed 477 Craigslist ads as if 477 is a lot of ads but she does not make any effort to determine how many sales resulted from these ads. She also does not consider that Craigslist does not charge for placing ads in the 'for-sale' category. Since there was no charge to Mr. Kudry, there is no expense that must be recouped in the furniture sales. Further, once an ad is entered into a Craigslist account, it is quite simple to re-post it: visit your account and click on the button. Voila! The ad is up again. This undoubtedly accounts for the vast majority of the '477' ad postings on Craigslist and should not be taken to indicate that Mr. Kudryn had 477 sets of furniture at various times.

In calculating loss amounts, the pre-sentence report writer notes the $300,000 that Mr. Kudryn agreed he spent on furniture, then relies upon the government figures of cost of each unit to determine that he sold 327 to 422 of the units. She notes that the units sold for $2300, so she reasons that Mr. Kudryn increased the price by more than 100%.

Again, though, this does not consider Mr. Kudryn's primary purpose in purchasing the furniture: defray the cost of shipping. No shipping costs are included in any of her calculations. Nor does she consider any import duties and tariffs imposed upon the furniture. Because the furniture was intended to defray the expenses of shipping items to Washington or Alaska, the furniture was priced so it did not create much income. Mr. Kudryn's profit for each set was one to two hundred dollars approximately. After all, Mr. Kudryn had a profitable business with Crave and he did not want to get into the furniture business so his anticipated profit on each unit was correspondingly low.

But anticipated profit is not a stand in for intended loss. Intended loss is the amount that the defendant intends for a victim to lose as a result of the fraudulent transaction. As an example, consider that Dan Defendant buys an apartment complex for $500,000. He sells it a year later and, because of economic good times, the apartment complex is now worth $600,000. Dan, though, is greedy and persuades an appraiser to estimate the cost at $750,000. Dan's anticipated profit is $100,000 and the intended loss is $150,000, but the anticipated profit and the intended loss are not the same.

In this case, though, the furniture was priced less than comparable sets were priced. In reality, there was no intended loss. If Mr. Kudryn had simply stated, "These furniture sets are made in China with Italian leather and I ordered a few sets to sell to help defray shipping costs on good for another business," there would be no crime. Because Mr. Kudryn purchased and shipped several sets at once, Mr. Kudryn was able to sell the furniture sets at a lower price than individual purchasers. That is, there is nothing stopping anyone in Alaska from calling the Duoxieyi Sofa Company and ordering the same furniture set and having it delivered to Alaska. With one furniture set, though, the shipping cost would mean such a purchaser would spend far more than the sets offered by Mr. Kudryn because the transaction cost would be significantly higher since there is only one transaction and the fixed shipping costs cannot be distributed among multiple sales.

Similarly, furniture companies have large warehouses, show rooms, salespersons and other costs so their costs are higher than Mr. Kudryn's costs. It is counter-intuitive, but given Mr. Kudryn's goals, he made his price lower in order to attract customers.

To apply a point made above, the purchasers wanted leather furniture. They got leather furniture. They got leather furniture for a lower price than they could have gotten leather furniture from most mainstream furniture stores. Mr. Kudryn intentionally set this up so buyers would be more likely to buy his furniture that he could defray his shipping expenses. In such a situation, how can the pre-sentence writer reasonably argue that there was an intended loss?

The government implicitly recognizes that the loss in this case is practically impossible to calculate. The parties agreed that Mr. Kudryn would pay $500 restitution for every victim that wanted their money back and presented such a request to the

government. Several purchasers have written affidavits to say that they got what they expected and are quite happy. They will not be seeking restitution.

For other purchasers, though, how should this court determine restitution? In contract cases, the damages would be the amount of money necessary to make a purchaser whole. What amount would that be when the purchasers actually spent less money than they otherwise would have? Recognizing the inherent difficulty of determining in these circumstances, Mr. Kudryn and the government compromised and agreed upon $500 in restitution for every person that claims it.

The obvious rejoinder to Mr. Kudryn's argument regarding the difficulty of intended loss amount is that if $500 is agreed upon for restitution, $500 could be the measure of intended loss. Intended loss is not the same as restitution, though, because the law requires some restitution but does not require an intended loss. The Guidelines give a base offense level of 7 but the amount increases based upon intended loss. If there is no intended loss, and none is necessary, there is no increase in the base offense level.

Further, the restitution is based upon claims made by purchasers. If 5 purchasers demand restitution, that is only $2,500.00. The affidavits from satisfied purchasers show that not every purchaser will demand restitution. Further, many sets were sold to family members. They will not demand restitution. The $500 became an easy way for the parties to compromise and address the legal requirement of restitution for every purchaser that demanded it. This avoids a lengthy and protracted restitution hearing, which was not in either party's best interest.

Intended loss, though, is a different creature and the difficulties inherent in ascertaining intended loss show that the $500 restitution compromise is a poor substitute for determining loss, especially when Mr. Kudryn did not intend loss.

The same difficulties are inherent in trying to determine actual loss. To determine actual loss would require proof of: what each victim would pay if they knew the furniture was made in China and the difference, if any, between that price and what they actually paid; or the difference in price between Mr. Kudryn's furniture and what the purchasers could have purchased on the open market. As evidenced from the attached comparison,

the price of Mr. Kudryn's leather furniture sets compare favorably with leather furniture sets recently available at Anchorage furniture stores.

The proposed enhancement would increase Mr. Kudryn's guideline level by 12 levels. Ninth Circuit law is clear that when a sentencing enhancement creates "an extremely disproportionate effect on the sentence," the government must prove that enhancement by clear and convincing evidence.[1] The Ninth Circuit bases this higher burden of proof upon the accused's right of due process.

The Ninth Circuit has not created a bright-line test but instead identified several factors to determine whether due process requires the higher burden of proof: 1) is the enhanced sentence within the maximum sentence for the crime charged in the indictment; 2) does the enhance sentence negate the presumption of innocence; 3) do the facts supporting the enhancement actually prove new offenses requiring separate punishment; 4) is the increase in punishment based upon the extent of any conspiracy; 5) is the enhancement five levels or more; and 6) does the proposed enhanced sentence more than double a relatively short sentence?[2]

The enhanced sentence is within the maximum sentence range and the facts for the enhancement do not prove a new offense so those factors do not weight against the enhancement. The fourth factor, whether the increase is based upon the extent of the conspiracy, is complicated. Mr. Kudryn has stated that some of the furniture sets were sent to family members. When Mr. Kudryn raised this in his objections to the draft pre-sentence report, the pre-sentence report writer dismissed the objection by saying, "There is a preponderance of evidence if Kudryn's family members sold some of the couches, it was part of the same course of conduct common scheme or plan as the instant offense, and that they more than likely not sold the couches under the same pretenses as the defendants." [Docket 80, p. 33].

---

[1] *U.S. v. Jordan,* 256 F.3d 922, 926 (9th Cir. 2001)(citing *U.S. v. Hopper,* 177 F.3d 824, 833 (9th Cir. 1999), *cert. den., McKendrick v. U.S.,* 528 U.S. 1153 (2000).
[2] *Id.* at 928, citing *U.S. v. Valensia,* 222 F.3d 1173, 1182 (9th Cir. 2000), *cert. granted, judgment vacated, and remanded by* 532 U.S. 901 (2001).

This statement negates the presumption of innocence because the pre-sentence writer assumes that Mr. Kudryn's family members are "more than likely not" guilty. There has been no evidence of any of the ads posted by any of Mr. Kudryn's family members. There is nothing that shows that they made any false statements in the Craigslist ads.

The pre-sentence writer does note that Mr. Kudryn's brother was involved in the furniture sales, but Mr. Kudryn's brother lives in Wasilla and is known to agents. Mr. Kudryn's other relatives are unknown and no evidence has been presented about them. The pre-sentence report writer notes that "the defendant is responsible for all couches he purchased and turned around and sold or had sold on his behalf, with the misrepresentation to consumers." This statement presumes that any sales by Mr. Kudryn's family were on his behalf and were based on any misrepresentation, neither of which have been justified by any evidence whatsoever. Thus, the second factor weights against use of this information for a sentence enhancement.

The fifth factor is if the enhancement increases the guideline levels by five or more. The proposed enhancement is twelve levels. The final factor is whether the proposed enhancement would double a relatively minor sentence. If the court accepted the other proposed enhancements, Mr. Kudryn would face a guideline level of 11:

| | |
|---|---|
| Base offense level: | 7 |
| Use of other's identity: | 2 |
| Number of victims: | 2 |
| Sophisticated Means | 2 |
| Acceptance of Responsibility | -2 |
| Total: | 11[3] |

At level 11 with criminal history category 1, Mr. Kudryn's sentencing range would be 8-14 months. At the proposed level 21, the guideline range is 37-46 months. This proposed enhancement then would more than double a relatively short sentence. For these reasons, this proposed enhancement, like the others, should be rejected.

---

[3] Mr. Kudryn is not stipulating or agreeing to the inclusion of those enhancements but using them as an example for purposes of analyzing the effect on the guideline calculation.

2.5 FINAL GUIDELINE CALCULATION

With these objections in mind, Mr. Kudryn would propose that his base offense guideline level would be 7 for the wire fraud charge. He would propose no enhancements based upon intended loss amount, more than ten victims, use of special skill, or use of someone's identity. At level 7, he would only receive a 2 level downward departure for acceptance of responsibility for a final adjusted offense level of 5. At criminal history category I, a level 5 results in a 0-6 month sentencing range.

3. § 3553 FACTORS

Pursuant to 18 U.S.C. §3553(a), this court is to impose a sentence that is "sufficient but not greater than necessary." This is an odd case for a variety of reasons and this case presents several 3553(a) factors justifying a probationary sentence as requested above.

3.1 MR. KUDRYN HAS NO CRIMINAL HISTORY

Mr. Kudryn comes to this court for his first criminal conviction. Several courts have found that a first conviction, particularly a first conviction that comes late in life, can be grounds for a departure.[4] Further, Mr. Kudryn will suffer the stigma and consequences of

---

[4] See *U.S. v. Paul*, 2007 WL 2384234 (9th Cir. 2007)(unpub.)(guideline sentence of 16 months (high end of guidelines) for taking government money was unreasonably high because defendant had no criminal record at all); *U.S. v. Baker*, 445 F.3d 987 (7th Cir. 2006)(affirming below guideline sentence of 78 months because a prison term would mean more to the defendant than someone who had previously been convicted in line with§3553;s requirement that the sentence be "just punishment" and "adequate deterrence"); *U.S. v. Santoya*, 493 F.Supp.2d 1075 (E.D.Wisc. 2007)(upholding below guideline sentence in part because a longer prison sentence is not necessary to deter someone who had not previously served any jail time); *U.S. v. Willis*, 479 F.Supp.2d 927 (E.D.Wisc. 2007)(upholding sentence of one year and a day in a drug case even though guideline called for 120 month sentence (statutory maximum was 60 months) because defendant had never been in trouble before); *U.S. v. Qualls*, 373 F.Supp. 2d 873, 877 (E.D.Wisc. 2005)("Generally, a lesser period of imprisonment is required to deter a defendant not previous subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

a felony.[5] For the rest of his life, he will not be able to purchase, possess or transport a firearm, a right that is taken more seriously in Alaska than other states. He will not be able to sit on a jury or hold public office. These are not small consequences. These facts justify a lower than Guideline sentence.

### 3.3 Mr. Kudryn Has An Excellent Work History

This factor justifies a lower than Guideline sentence.[6] His work history has been excellent, working as a professional pilot and running his own business. This demonstrates that he has been and can be a productive citizen. A lengthy prison sentence is not necessary to deter him or to rehabilitate him.

### 3.4 Mr. Kudryn Has Behaved Exceedingly Well While Under Pre-Trial Services Supervision

Mr. Kudryn was released from detention early in this case. He was arrested on May 16 and was released from custody on May 18. [Docket 8]. Since being supervised by pre-trial services, Mr. Kudryn's conduct has been exemplary.[7] Since his plea, he has been

---

[5] See *U.S. v. Adelson,* 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006)(in a securities fraud case in which the guidelines called for life imprisonment, the court sentenced the defendant to 42 months in part because the prison sentence would specifically deter him because the conviction would ruin his reputation, making it "extremely unlikely he would ever involve himself in future misconduct." The court also noted defendant's exemplary life prior to these charges.); *U.S. v. Wulff,* 758 F.2d 1121, 1125 (6th Cir. 1985)("a felony conviction irreparably damages one's reputation."); Wayne A Logan, *Informal Collateral Consequences*, 88 Washington Law Review 1103, 1107 (2013)("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."); Michelle Alexander, The New Jim Crow, 94 ("Once a person is labeled a felon, he or she is ushered into a parallel universe in which discrimination, stigma and exclusion are perfectly legal.").

[6] See *U.S. v. Ruff,* 535 F.3d 999 (9th Cir. 2008)(sentence of one month and one day reasonable in part because of defendant's history of strong employment); *U.S. v. Baker*, 445 F.3d 987, 922 (7th Cir. 2006)(upholding a below guideline sentence based in part upon defendant's history of employment and higher education); *U.S. v. Jones*, 158 F.3d 492(10th Cir. 1998)(pre-*Booker* case granting downward departure for felon in possession of a firearm in part because of the defendant's long work history).

[7] *U.S. v. Munoz-Nava*, 524 F.3d 1137, 1149 (10th Cir. 2008) (in drug case where guidelines 47-56 months, district court's sentence of one year and day in prison and one year home detention reasonable in part because of defendant's "behavior while on a year-and-a-half pretrial release, which the district court found to

allowed to leave the country with advance notice to his pre-trial services over-seer. He has left the country and returned on a few occasions, none of which have created any issues with his conduct while on pre-trial release. His exemplary conduct while on pre-trial release shows that prison is not necessary to make Mr. Kudryn follow any rules or laws and is another reason why this court should impose a probationary sentence.

### 3.5 The iPad Sales

The iPad sales should not be a 3553(a) ground for a higher sentence for a variety of reasons. First, as noted above, use of the iPad sales can allow uncharged conduct to be the tail that wags the dog contra *Jordan* as described above.

Second, Mr. Kudryn voluntarily stopped the iPad business several years ago. Third, Mr. Kudryn forfeited almost $600,000 to resolve that matter. While forfeiture, restitution, fines and imprisonment serve different ends, $600,000 is a lot of money and it certainly impacted Mr. Kudryn's business and bottom line.

The pre-sentence report writer argues that the iPad sales should be part of the same conduct, but they are really quite separate. Other than Mr. Kudryn's brother Vitaly's role in the iPad sales, all other facts show that these are different enterprises. Purchasers of furniture were in Alaska. iPad purchasers were in the U.K. and elsewhere in the world. Mr. Kudryn directly purchased the furniture from China while negotiating with brokers for the iPad sales. The iPad sales were an integral part of Mr. Kudryn's business plan while they were occurring while the furniture sales were ancillary to cover shipping costs.

The pre-sentence report writer says that the two conspiracies were connected in time, but the iPad sales were involved with Wireovia, one of Mr. Kudryn's companies. The furniture was directed primarily to address shipping costs for Crave. The pre-sentence

---

be exemplary" which is shows defendant unlikely to reoffend); *U.S. v. Baker,* 502 F.3d 465, 468 (6th Cir. 2007) (where defendant pled guilty to possession of unregistered firearm arising from altercation with wife during which gun accidentally discharged and guideline range 27-33 months, below-guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services).

report writer says that some items were shipped from China, but China is a major trading partner with the United States and a great many items are imported from China.

    Ultimately, the iPad sales show why Mr. Kudryn was indicted and why the parties agreed upon the forfeiture. Sentencing for a separate, unrelated crime is not the time to try to determine the number of victims, actual or intended loss amount or fill in large sections of missing data necessary to craft a sentence. The iPad sales should not be used to increase Mr. Kudryn's punishment.

4. CONCLUSION

    Mr. Kudryn comes to this court having been convicted of wire fraud. This is not a typical wire fraud case, though, and the circumstances of this case justify a probationary sentence.

    This court should sentence Mr. Kudryn to a sentence of three years probation with a small fine. Considering the loss amounts and the conduct at issue in this case, such a sentence would meet the §3553(a) factors.

    DATED this 20th day of May, 2019, at Anchorage, Alaska.

                                Steven M. Wells, PC
                                Attorneys for Defendant

                   By:    /s/ Steven M. Wells   .
                                Steven M. Wells
                                ABA #0010066

CERTIFICATE OF SERVICE

I certify that on May 20, 2019,
I served a copy of the foregoing
Electronically on:

All Parties of Record


     /s/ Steven M. Wells        .
Steven M. Wells, PC