UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
)
     Plaintiff, )
)
vs. )  CASE NO. 3:18-cr-00056-SLG
)
DMITRY KUDRYN, )
)
     Defendant. )
_____)


TRANSCRIPT OF IMPOSITION OF SENTENCE
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
August 14, 2019; 3:30 p.m.
Anchorage, Alaska


**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY:  ADAM ALEXANDER
222 West 7th Avenue, #9
Anchorage, Alaska 99513
(907) 271-5071


**FOR THE DEFENDANT:**
Steven M. Wells, PC
BY:  STEVEN M. WELLS
431 West 7th Avenue, Suite 107
Anchorage, Alaska 99501
(907) 279-3557


_____

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

```
 1              (Call to Order of the Court at 3:30 p.m.)
 2              DEPUTY CLERK:  All rise.  Her Honor, the Court,
 3      the United States District Court for the District of
 4      Alaska is now in session, the Honorable Sharon L.
 5      Gleason presiding.
 6              Please be seated.
 7              THE COURT:  Good afternoon.  We're on record in
 8      United States versus Kudryn.  Mr. Alexander is here, and
 9      who do you have with you, Mr. Alexander?
10              MR. ALEXANDER:  Your Honor, this is Special
11      Agent Clinton Wight from IRS.  He is the co-case agent
12      in this matter.
13              THE COURT:  Good afternoon.  Mr. Wells is here
14      with Mr. Kudryn.  And it's the time set for sentencing.
15      Mr. Jedrosko is somewhere.
16              MR. JEDROSKO:  I'm here, Your Honor.
17              THE COURT:  There you are.  All right.  And
18      ready to proceed, Mr. Alexander?
19              MR. ALEXANDER:  Yes, Your Honor.
20              THE COURT:  Ready to proceed, Mr. Wells?
21              MR. WELLS:  Yes, Your Honor.
22              THE COURT:  Well, I have read through
23      everything that the parties have submitted, and read
24      through the presentence report.  And first with regard
25      to those issues, maybe I'll hear from the parties first
```

1  with regard to the issues that were set out in the

2  guideline calculation.

3          In terms of the facts, there is no dispute,

4  other than their inclusion of some of the facts; is that

5  correct?

6          MR. WELLS:  I think the general overall -- I

7  think generally there is not a dispute.  I think that

8  there is a couple things we quibble about, but not

9  outright dispute, such as what was paid for the

10 furniture and what they were intending to do.  But

11 overall, no, we don't quibble with the facts.

12         THE COURT:  The plea agreement had a different

13 amount paid for the furniture.  I believe it was $1,050.

14         MR. WELLS:  That's right.  That's what we had

15 calculated, which is what we had relied upon.

16         THE COURT:  And the -- as I recall the PSR says

17 $700 to $900.

18         MR. WELLS:  Right, and that's why we would rely

19 upon what the plea agreement had said.

20         THE COURT:  Mr. Alexander, what's the

21 Government's position on that?

22         MR. ALEXANDER:  I agree with Mr. Wells.  The

23 plea agreement should control here.

24         THE COURT:  Which paragraph was that discussed?

25 Was it just on that enhancement or is it in the

1    preceding paragraphs, Mr. Jedrosko?

2            MR. JEDROSKO:  Your Honor, I believe it's in

3    paragraph 25.

4            THE COURT:  All right.

5            MR. WELLS:  22 and 25, Your Honor.

6            THE COURT:  I see it in 22, and then isn't it

7    where the enhancement was computed also?

8            MR. WELLS:  Right, that would be paragraph 44.

9            THE COURT:  I see that, yes, 44.  And so I'm

10   not sure it would change the math with regard to the

11   guideline range as computed by probation.

12           MR. ALEXANDER:  I don't believe it does, Your

13   Honor, but I don't have any objection to substituting

14   the number from the plea agreement.

15           THE COURT:  And it was $1,050; is that correct?

16           MR. WELLS:  Yes, Your Honor.  That's what we

17   had negotiated.  Well, not just negotiated, but that's

18   what we had calculated, which is why we had agreed upon

19   that with the Government.

20           THE COURT:  Mr. Jedrosko, can you make that

21   change?

22           MR. JEDROSKO:  Yes, Your Honor.

23           THE COURT:  Other factual disputes, no?

24           MR. WELLS:  No.  There is no other factual

25   disputes.

1          THE COURT:  And I guess on the -- it's kind of

2     an interesting plea agreement where you have this

3     admitting to the facts set out in the search warrant

4     affidavit, and my thought in reading all of this and

5     looking at the charging document, the plea agreement,

6     was to propose the following:  To take the portions of

7     the offense conduct that relate to the Amazon issue and

8     move them to -- there is a portion that's after --

9     Offense Behavior Not Part of Relevant Conduct,

10    paragraphs 55 through 57.

11         MR. ALEXANDER:  I don't have any objection to

12    that, Your Honor.  I think that's an appropriate way to

13    acknowledge the distinction between exactly that.  It's

14    not necessarily offense conduct in this matter, but

15    certainly relevant to the Court's consideration.

16         MR. WELLS:  I would agree with that, because

17    that does -- that does outline -- that outlines where we

18    were in the plea agreement, but also specifically

19    identifies that's it's not relevant conduct, which is

20    one of our objections, because I understood that we

21    agreed to that, I understood that was part of the plea

22    agreement, I understood it would be in the presentence

23    report.  My objection was to consider it relevant

24    conduct, and so that was one of my objections.

25         THE COURT:  Let's see if we can agree then on

which paragraphs would apply.  Would it be 6 through 21;
is that correct?

        MR. ALEXANDER:  Yes, Your Honor.

        MR. WELLS:  Yes.

        THE COURT:  Mr. Jedrosko, any disagreement with
that approach?

        MR. JEDROSKO:  No, Your Honor.

        THE COURT:  So that would resolve then the
issues related to the factual basis, correct, and then
we can turn to the applicability of the enhancements.

        MR. WELLS:  Okay.

        THE COURT:  I will find that all of the
statements of fact in the presentence report as modified
here are supported by a preponderance of reasonably
reliable evidence and I'll adopt them and make them
findings of fact for this proceeding.  And I also do
intend and will now accept the terms of the parties'
plea agreement.

        So why don't I hear first from Mr. Wells with
regard to these disagreements with the guideline
calculation by the probation officer.  Although, the
Government agrees with the defense with regard to
deleting paragraph 47 on the Omelchuk identification, as
I read your memorandum.  Mr. Alexander, is that correct?

        MR. ALEXANDER:  I'm sorry, Your Honor.

1          THE COURT:  Take a moment.  When I read your

2    sentencing memo earlier today, I thought there was

3    agreement, and if I'm wrong --

4          MR. ALEXANDER:  No.  Your Honor, I have to

5    confess I don't remember one way or the other.

6          THE COURT:  You wrote this in May.  No wonder.

7    I read it this morning, so I have an advantage there.

8          MR. WELLS:  Part of the problem, Judge, is I

9    have been in trial for the past two months.

10          THE COURT:  There you go.  That's fine.  Take a

11    moment.  It's page four of the Government's sentencing

12    memorandum at Docket 93.  Actually, begins in the

13    preceding page, but I read the Government there -- you

14    know, the confusion I will say is that you reference

15    paragraph 46, but the Omelchuk was paragraph 47.

16          Do you need to take a few minutes,

17    Mr. Alexander?

18          MR. ALEXANDER:  No, Your Honor.  I found the

19    place in my sentencing memorandum.  No, as I stated

20    there, Your Honor, that's correct.  Thank you for the

21    Court's patience.  Just for the record, I wrote in my

22    sentencing memorandum that the latter specific offense

23    characteristic relating to false identification

24    documents as stated in paragraph 47, as the Court points

25    out perhaps should be 46, should not be adopted by the

1　Court because, although true, it relates to the Apple
2　scheme rather than the count of conviction related to
3　the sofa scheme.
4　　　　　THE COURT:  Take a moment.  I believe it's 47,
5　but there is agreement?
6　　　　　MR. ALEXANDER:  That is what I put in my
7　sentencing memorandum, Your Honor.
8　　　　　THE COURT:  I don't know why I have got 46 on
9　page --
10　　　　　MR. ALEXANDER:  I wrote 47 at the top of page
11　four.
12　　　　　THE COURT:  I'm looking at the middle of page
13　three.  Anyway, that's fine.  Oh, no, I'm looking -- I'm
14　on track.  All right.
15　　　　　47 is deleted.  Any question about that,
16　Mr. Jedrosko?
17　　　　　MR. JEDROSKO:  No questions, Your Honor.
18　　　　　MR. ALEXANDER:  Just to interrupt briefly, Your
19　Honor.  I think it may be -- I did say "should not be
20　adopted by the Court," but that paragraph may be
21　relevant to put in that same section that we previously
22　discussed regarding relevant conduct that's not offense
23　conduct.
24　　　　　THE COURT:  So what's your proposal?
25　　　　　MR. ALEXANDER:  So --

1          THE COURT:  It wouldn't factor into the

2     guidelines.

3          MR. ALEXANDER:  No, and it should not factor

4     into the guidelines.

5          THE COURT:  I think it's already covered in the

6     5 through 21.  So I don't know if we need a guideline --

7     what's your proposal, Mr. Alexander?  Let's hear it.

8          MR. ALEXANDER:  Your Honor, we just discussed

9     moving paragraphs 5 through 21.

10         THE COURT:  Right, to add to 55 through 57.

11         MR. ALEXANDER:  And I believe that the court is

12    correct that that paragraph 47 is duplicative of the

13    information contained in paragraph 17.  That's a long

14    way of saying that I don't oppose striking it

15    altogether.

16         THE COURT:  What I can hear are the arguments

17    with regard to remaining enhancements, the 12-level and

18    the two-level for ten or more victims and the two-level

19    for whether a substantial part of the fraudulent scheme

20    was committed from outside the United States.

21         I would see it was -- I'm inclined to say that

22    the conduct at issue in the charge here before me was

23    not under 2B1.1(b)(10)(C), but it would in my mind, even

24    when viewed in isolation, at least it would be

25    interesting in the parties' arguments as to whether or

1  not the conduct with regard to the furniture had a

2  substantial part of it committed outside the United

3  States.

4         So I do recognize taking Amazon out of the

5  picture.  Is there still a basis for saying a

6  substantial portion was committed outside the United

7  States?  And so -- and the other question I had before I

8  hear from you both on the guideline was there is a

9  portion of the loss calculation that relates -- let me

10  see if I can find it.

11         That provides that in certain circumstances the

12  Court can look to -- it's on page 90.  It says, "The

13  Court shall use the gain that resulted from the offense

14  as an alternative measure of loss only if there is a

15  loss but it reasonably cannot be determined."

16         And my question is whether or not that

17  particular application note should apply, so that's

18  application note 3(B) of 2B1.1.

19         So go ahead, Mr. Wells.

20         MR. WELLS:  Thank you.  Your Honor, let me

21  address the complicated scheme which deals with how much

22  is outside.  Judge, I think that as far as the

23  complicated scheme, how much was related to outside the

24  United States, I think that had to do with the

25  manufacturer.

And what's relevant, what's driving this is Mr. Kudryn's statements to support the sales, not necessarily the manufacturer. If he had just said, "This is Chinese furniture, made from Italian leather," there wouldn't be any issue. So if he had done the exact same thing and just said that, we would not be here.

So what does that say? It says that what's driving this case is his statements, which were made in the United States and were made through Craigslist, which would then not be in the -- not be outside of the United States. And I think that then takes it out of the realm of a special skill or anything like that. That's why I don't think that that applies because all of his statements were made within the United States.

As far as the ten or more victims, this is an odd case. And I'll talk about the valuation in just a minute, but this sort of dovetails with it.

This isn't a typical fraud case. One of my affidavits the woman wrote, and she was a Lieutenant Colonel with the Air National Guard, she wrote, you know, "I wanted leather furniture, I got leather furniture. Fraud is I pay for leather furniture and I get nothing."

And so you stop and say, okay, what is a victim

in this case. Well, there is two, I think -- I think
you got to separate "I'm not happy with what I paid for"
versus "I got something I didn't bargain for." Those
are two separate things. If you go to Nordstrom and you
buy a leather jacket and you're sitting there going, "I
really like this," and you walk out of the store and you
go, "Oh, I have got this," you reach over and the
shoulder all rips out, you're not happy with your
purchase. Why? Because you were defrauded? No,
because you don't like the quality.

So what the Government has said is -- and these
two really combine, I think, together. So it's not --
there is not an easy way to break this apart. So what
the Government has said is Mr. Kudryn made statements
that this furniture was made in Europe, made in Italy,
when it was actually made in China. That's true.

So the question then is how does that impact
this case, because in order for it to be -- what they
are talking about is what we used to call fraud by the
inducement, getting somebody to buy something that they
would not otherwise by.

And they haven't identified anybody that's done
that. They've identified people that have said, "You
know what, I didn't like his business practices, he
wouldn't let me use a credit card," he did this, that or

the other, but nobody has ever said, "You know what, if
I had learned that it was made in China, I wouldn't have
bought it."  Nobody ever said, "You know what, if I
learned that he was just selling these piecemeal so that
he could cover shipping for some of this other stuff, I
wouldn't have bought it."

Instead what's happened is everybody has said,
"I wanted leather furniture, I paid for leather
furniture, I got leather furniture."  We have
essentially two groups of victims.  One is the
Government's agent, which got Mr. Kudryn to say, "Yes,
it's made in Europe."  We have other people that are
unhappy with their purchases.

That I don't think -- I don't think those quite
-- I think for the Government to establish fraud, they
have got to -- they have to establish that people
essentially relied upon these fraudulent statements to
make a purchase rather than just they were subsequently
dissatisfied with their purchase.

And so we have included -- and I've got
actually another one if it would help the Court.  We
have included several affidavits from, like, 13
different people that have all said, "You know what,
listen, I knew what I was getting and I got what I paid
for and I'm happy with it."

1          Now, the significance of that, Judge, is that

2    we now have some people that are dissatisfied, but they

3    are dissatisfied with what happened, not because they

4    didn't get what they paid for.  And we have got some

5    people that are very satisfied.  But we don't have

6    anybody that's come in and said, "You know what, I

7    didn't want anything from China.  And if I had been told

8    it was from China, I wouldn't have purchased it."  Or,

9    "I didn't want something -- Mr. Kudryn told me that this

10   was an overstock and if I had known how he was doing

11   this, I wouldn't have purchased it."

12          We don't have anything like that.  We don't

13   have anybody that's identified as a victim that can tie

14   Mr. Kudryn's fraudulent statements to their conduct.

15   And so because -- so I think that, A, we've got a

16   problem identifying victims in that way; B, I think the

17   idea that everybody that purchased it is a victim is

18   wrong, because we have identified several people that

19   were happy with their purchases, and so -- and they got

20   what they paid for.  They wanted leather furniture, they

21   got leather furniture.

22          And so to say then that everybody that

23   purchased it was a victim, I think is incorrect.  And I

24   think if the Government wants to increase Mr. Kudryn's

25   punishment, they bear the burden of proof.  And even

giving them everything, they have established six people

that they can say are victims.

Judge, they have got to show more than ten.

And when we have come in and shown that we have got

roughly double the number of people that are happy with

their purchase, then I think there is a legitimate

question how many people got what they wanted and are

like, "Hey, you know what, it's 2300 bucks for a leather

set of furniture off Craigslist, hey, I realize I'm not

dropping $10,000 at Williams & Kay, this fits my needs,

does what I want, I'm happy."

We don't have any idea. The Government seized

Mr. Kudryn's computers, they seized his phones, they

seized his communications. I know many of these

payments were in cash, but, number one, Mr. Kudryn

reported them on his taxes. There is no information

that that didn't happen. They also had his phone

numbers. They could have gone back and said how many

people called this number from Alaska numbers, because

if he's running his business internationally, all right,

then why are people from Homer calling him, why are

people from Wasilla calling him.

And the Government could have done that. The

Government didn't do that. So number one, I think that

the way that we have set this up, we can show not

everybody is a victim.  Number two, they had the
opportunity to go through and find if there were more
people, and they didn't.  All they have established is
six people.  And then number three, the people that they
have identified as victims are not people that came in
and said, "You know what, I didn't get what I paid for."
What they've said is, "I'm not happy with the quality of
what I paid for."

And that's a very big difference.  And so
because of that, I don't think the Government has met
their burden of proof as far as the ten victims.

As far as the valuation, should the Court
include that other section?  I think the answer is no,
because in this case, it isn't that the loss amount is
hard to figure, it's that we wind up with a really weird
case where there isn't a loss amount.  Specifically,
there is no intended loss amount.

To have an intended loss amount, you would have
to have Mr. Kudryn sell something or wind up with more
than what he sent was and what's it's worth.

Now, worth is -- worth is a weird concept,
because worth is not absolute.  Worth is what is the
highest bidder willing to pay for it, and that can vary.
And so in this case, what we have are furniture sets
that are priced -- and I included a comparison.  If the

1  Court wants, I have got the person that did the

2  comparison.

3          THE COURT:  That's fine.

4          MR. WELLS:  I have got a comparison to show

5  that these were priced within the market range, even on

6  the low end of the market range, of furniture of this

7  type.

8          So what you would have to establish for any

9  sort of intended loss -- and that word intended is

10  important.  You would have to establish that Mr. Kudryn

11  wanted somebody to pay more than what something was

12  worth.  So you take a car and you say, "Oh, yes, this is

13  a Ferrari.  Yes, it's expensive, but you know what, this

14  Ferrari was owned by Steve McQueen," and so now instead

15  of $500,000, it's a million.  What's you're intended

16  loss?  $500,000.  It's pretty easy.

17          But here, all of those furniture sets actually

18  cost more, and so the intended loss is, particularly

19  considering how Mr. Kudryn was trying to -- what he was

20  doing, the intended loss really doesn't exist in this

21  case.  Because what Mr. Kudryn was doing was using these

22  to pay for his shipping, because the shipping container

23  to go from China to Seattle was $2,000, but from China

24  to Anchorage was $10,000.

25          And so what he would do is put in roughly ten

of these units and he would sell them, we agreed $1,050 was the cost, he would sell them for about $2,300.  His goal was to make sure that the furniture sales underwrote the cost of the shipping.  So all of the iPad charging cords and cases and things like that, that essentially their shipping had been paid for and it enabled him in Alaska to compete with businesses in the Lower 48.

The example, the thing that came to my mind when I thought of this, I lived for several years in Dillingham and every year during the fishing season a lot of people would come out and they'd work the fishing processing places.  Well, what most people don't realize is those fishing companies are owned by Japanese conglomerates.

And the Japanese would send a quality inspector over and what they really wanted were the fish eggs. The fish eggs had to be just right.  They got to get the salinity right, they got to be cured right and all of that.  And a friend of mine who ran a bed and breakfast had a 747 pilot who said, "When we fly those fish eggs from Anchorage to Tokyo, it's one of the few times that the cargo is worth more than the plane."  What happens is that the fish eggs pay for the cost of everything.

So when you see those cans of canned salmon,

those are all pure profit because the cost to process them and can them and do all of that has already been paid for by the eggs.

In the same way what Mr. Kudryn was trying to do was to say, "I don't want to make a ton of money on this furniture. I want enough that it pays essentially for my time and expenses, but it pays my shipping so that I can compete."

So when you have that, you say how is there any real loss, because even if he -- the Government says, "Oh, this is worth $4,800." How much of that, Judge, is puffery? How much of that is --

MR. ALEXANDER: We don't say --

THE COURT: I don't think anybody is saying it's worth 48 -- well, I think Mr. Kudryn did at one point.

MR. WELLS: There was some discussions about that in the PSR. And so that was not used in one sense as an intended loss. Rather, what Mr. Kudryn is trying to do is to say, "Look, if you compare these sets -- my sets of furniture to other sets of furniture that you're going to find, you're going to find I'm in the ballpark, actually, on the low end of the ballpark."

So his goal wasn't to sell somebody something that they didn't get. Everybody, even the people that

aren't happy agreed, "I paid for leather furniture, I
got leather furniture." Maybe they weren't happy with
the quality, but they got that. So his intent was not
to get them to buy it at an inflated rate. His intent
was not to get them to buy it at a price that was
outside the market.

Nobody disagrees with that. Where we disagree
is what were the statements that he used to persuade
somebody to purchase it. And if he had said, "Hey,
look, this is Italian furniture made in Italy and
normally these furniture sets are $10,000 and I'm
selling them for $6,000, because you can compare them,"
you know, you might have -- we would be in a profoundly
different spot.

What he is doing here is covering his shipping
charges and putting them on the low end of the cost
comparison. There isn't an intended loss. He isn't
trying to make himself rich in one sense at the expense
of somebody else like saying something is what it isn't,
in the sense like this is Steve McQueen's Ferrari. What
he's doing is trying to get somebody to buy something
and they get what they pay for, that is, they buy
leather furniture, they get leather furniture.

In that respect, Judge, I disagree with the
intended loss calculation in the presentence report,

because, A, it presumes there is an attempt for loss,
but, B, the other thing that it does is it says, "Here
is $300,000 that was spent," and it uses that
calculation as a substitute for intended loss. But
again, if I buy a house for $200,000, the market goes up
50, I get an appraiser to give me a fake appraisal for
350, then, you know what, my intended loss is 100, it is
not 350.

And that's what the the Government is doing in
this case. They are ignoring that out of that 300, some
of that went to buy the furniture, some of that went to
pay for the shipping, some of that then went for all the
processing. They are ignoring that, and that whole cost
then becomes intended loss.

And I don't -- what we have got, Judge, is
fraud in the inducement, not necessarily a fraudulent
misrepresentation about the value of something. And
that's a profound distinction in this case and why there
isn't an intended loss.

I think that to the degree the Court wants to
look for a loss, I think that the restitution should not
be substituted, but I think there is now -- I think
there is five identified in the presentence report and
the Government has said there is one other person, there
is six people that have come forward and said, "You know

what, we did not get what we paid for, we're not happy, we have agreed to $500 in terms of restitution." And part of that was because of the complexity of determining restitution. Part of that was just the recognition that this isn't a typical case in which, "Hey, I sent somebody $2,500 to get furniture and I got nothing." It recognizes that they did get something, maybe it wasn't the quality of what they wanted, but, again, it's kind of odd because we got some people that are happy and some people that aren't.

For that reason, Judge I think we really are in a situation where there should not be an intended loss. It's an odd situation and it's not that -- it's not that the loss is hard to calculate, it's that given how everything was done, Mr. Kudryn's intent was not for there to be a loss.

I know it's weird, but there actually are -- that actually has happened a few times, and I think in this case, this is an appropriate case to do that. Certainly when you look at the markup, at $1,050, they're being sold for roughly $2,300, if he's trying to distribute $10,000 of cost between ten items, thereabouts, you're looking at roughly $2,000 in costs per unit, so that's how we arrived at the roughly $200 to $300 profit in each one that we listed and that

1    Mr. Kudryn put down on his taxes.

2         That's what we included in our sentencing memo.

3    But, again, the profit is not intended loss.  The

4    intended loss has to be what did he intend to deprive

5    the people of by his false statements.  And really what

6    it was is sort of overstepping his bounds in an effort

7    to get somebody to agree to a transaction as opposed to

8    getting them to actually lose money on a transaction.

9         And I think that's a different -- it's a subtle

10   distinction but it's an important distinction in this

11   case, and that's why we wrote that there really is not

12   an intended loss in this case.

13        THE COURT:  Mr. Alexander, go ahead, please.

14        MR. ALEXANDER:  Thank you, Your Honor.  Judge,

15   I think it might be helpful to begin just by reiterating

16   the standard obviously that the Court knows as far as

17   determining the trustworthiness of information, factual

18   information presented in the PSR as far as making a

19   determination of about an offense characteristics.

20        My understanding is that the threshold here is

21   whether or not the Court finds it to be reasonably

22   reliable in terms of the information that's presented in

23   the PSR.

24        THE COURT:  Do you agree that the clear and

25   convincing evidentiary standard would apply when it's a

1   12-level enhancement?

2           MR. ALEXANDER:  I certainly wouldn't have any

3   objection to applying a higher and clearer convincing

4   evidence.  I think we have got evidence beyond a

5   reasonable doubt and we would have been prepared to

6   prove such at trial should this have arisen in that

7   context.

8           Your Honor, as far as I could track Mr. Wells'

9   argument, at least in part it seemed to boil down to the

10  fact that Mr. Kudryn did not intend -- didn't act with

11  an intent to defraud.  If that's an argument that's

12  being seriously pressed here, then we may be in a

13  different posture given the statement of facts that

14  Mr. Kudryn stipulated to for his change of plea, the

15  fact that the statement of facts does pretty

16  specifically detail the fraudulent mental state and the

17  fact that he acted with an intent to defraud in the

18  course of the sofa conspiracy.

19          And in discussing that conspiracy looking at

20  that statement of facts --

21          THE COURT:  If you could hold on just a minute.

22  I've got it right here.  Which page are you on?

23          MR. ALEXANDER:  Docket 65, Your Honor.  It

24  begins at the bottom of page four and continues to the

25  top of page eight.

1       So several things, Your Honor.  As part of that

2    factual basis, as we have already discussed, Mr. Kudryn

3    stipulated to the truthfulness of the allegations, both

4    in the indictment and in the seizure warrant that we

5    discussed, isn't relevant conduct for the purposes of

6    this offense, but other conduct that has been included

7    in the PSR and the truthfulness has been stipulated to.

8       But I think it's important to stress as well

9    that probation has independently assessed and reviewed a

10   significant amount of the Government's evidence and

11   discovery in that matter in arriving at the loss

12   calculation that's ultimately reflected in the PSR.  So

13   I do want to make a note that it's not -- wasn't just a

14   rote adoption of some arbitrary loss calculation that

15   was stipulated to in the plea agreement, but rather that

16   probation did their own independent assessment and

17   calculation on the basis of the information, not only in

18   the stipulated factual basis in the plea, but also in

19   the discovery as well.

20      Returning to that factual basis, Your Honor, as

21   we proceed through it, there is no dispute that

22   Mr. Kudryn, along with uncharged co-conspirators,

23   purchased at least $300,000 worth of wholesale furniture

24   from the Duoxieyi sofa factory in China, and in part

25   based on preexisting import/export relationships that

Mr. Kudryn had in the area relevant to other business ventures, including the Amazon/Apple case that resulted in the forfeiture of the funds seized in that matter and resolved as part of the global plea agreement in this matter.

And it's similarly undisputed that Mr. Kudryn advertised those sofa sets that he purchased in China and had imported from China in the District of Alaska using Craigslist.com and materially misled, and I'm just reading from the stipulation of facts, "Materially misled customers by representing the furniture purchased in bulk and delivered to his commercial property in Wasilla left, not just the country of origin, but also the fact that they consistently misrepresented them as leftover samples and that the furniture was being offered at a discounted price.

So there is actually multiple materially misleading statements of fact that were involved in the bulk of these hundreds and hundreds and hundreds of Craigslist postings that Mr. Kudryn placed between July, the period of the conspiracy that's charged, July of 2014 and March of 2018.

That's when we get to the actual overt acts that Mr. Kudryn agreed that he committed in the course of this conspiracy. As we discussed earlier, I think

Mr. Wells was appropriate for us to recalculate based on the bottom of page six of the plea agreement. And I think this is a conservative and generous cost estimate to Mr. Kudryn that each of the complete sets that he purchased in China cost him approximately $1,000, the $1,050 listed there, and that they were then shipped to fill containers that were being returned to the United States.

And this is maybe where Mr. Wells got this $4,800 figure, it's not that the United States isn't asserting that these were worth $4,800, quite the contrary. As the Court pointed out and as Mr. Kudryn has stipulated, it was Mr. Kudryn who represented to his customers that each of these units was worth $4,800.

And so it's not just the country of origin, but it's also the material misrepresentation regarding the valuation, which is exactly Mr. Wells' analogy or example about the Ferrari, lying about the origin of the Ferrari and saying that the Ferrari is worth a million dollars when it's only worth $500,000.

That's exacty what Mr. Kudryn did here in the course of the conspiracy, again, acting as he stipulated that he did with the material intent to defraud the customers involved. That's not to say that there may be some people, and I'm not necessarily disputing the

truthfulness of some of Mr. Wells' representation, that there may be some individuals to whom Mr. Kudryn told the truth or knew the truth of the matter through a family relationship or friendship, knew that these were sofas coming in from China.

But I think that's a far cry from arguing that there aren't ten victims here. I think there is certainly clear and convincing evidence before the Court that there is at least ten victims here, not just in the representative sample of victims who are actually named in the discovery and then also included in the presentence report undisputed, but also critically, Your Honor, I think it's important to note that the stipulations as well included the fact that there were hundreds of postings, as is discussed, at least 477 postings between 2014 and 2018, made by Mr. Kudryn to the Craigslist marketplace in order to sell these items that included these material misrepresentations.

So, Your Honor, I would argue that on the basis of the stipulated facts in the plea agreement at Docket 65, in addition to the very thorough review -- thorough and independent review of the discovery that's provided in the presentence report and the rationale that's listed for that 12-level enhancement at paragraph 44 of the presentence report discussing the specific offense

characteristics relevant to loss and assessing it
between the $250,000 and $550,000 threshold, that that
is correct.

I would argue as well, Your Honor, and the
Court noted this earlier, as far as the use note for
Section 2B1.1, use note 3(B), saying that the Court
shall use the gain that resulted from the offense as an
alternative measurement of loss only where it can
reasonably determine. I think there is actually a
fairly straightforward, and this is how probation has
calculated it as well, way of assessing both the gain
and the loss and that difference between the overall
amount that Mr. Kudryn spent on these items and then the
amount that he was advertising them for sale and
fraudulently, in furtherance of doing so in the course
of the conspiracy charged here, making those material
misrepresentations of fact, including what their retail
value was, the fact that he was consistently claiming
that they were worth $4,800 retail, that he would sell
them for $2,400 because they were seconds left over,
again, over and over and over again, as well the fact
that they were manufactured in Italy when obviously they
were -- he was in a position to know that they were
manufactured in China.

That's a very lengthy way of saying, Your

1  Honor, that the stipulated facts unless -- Mr. Wells'
2  argument could be interpreted one of two ways.  It could
3  be interpreted as kind of arguing a reasonable argument
4  as to loss, which is the way I interpreted it.  It could
5  also in certain ways be taken as a lack of acceptance of
6  responsibility and a fundamental dispute with the
7  statement of facts that were stipulated in the plea
8  agreement.

9       I'm not reading it that way, but at the end of
10 the day, I do think there is clear and convincing
11 evidence in the record, in the stipulation of fact and
12 in the summary of the facts that the Court can rely on
13 in the presentence report that Mr. Wells has agreed to
14 that the assessment in paragraph 44 discussing loss is
15 accurate.

16      THE COURT:  All right.  What about your
17 position, Mr. Alexander, with regard to the enhancement
18 on whether or not a substantial part of the fraudulent
19 scheme was committed from outside the United States?

20      MR. ALEXANDER:  I think that's well taken as
21 well, Your Honor, for the following reason:  This
22 scheme, the conspiracy -- the sofa conspiracy, much like
23 the Apple and Amazon conspiracy that's not part of the
24 offense conduct but is included and the truth has been
25 stipulated to, could not exist but for Mr. Kudryn's

business acumen and his relationships in China and the
actual sale of those items and importation by Mr. Kudryn
directly from China to here.

Mr. Kudryn wasn't buying these sofas in Seattle
and having them shipped up here and then lying and
saying, "Oh, no, they are made in Italy," when in fact
they were made in China. This was a direct
import/export relationship or direct import relationship
with the wholesaler itself, the factory in China.

So this is, I think, reasonably one of those
circumstances where a substantial part of the fraudulent
scheme was committed from outside of the United States
because it was that financial relationship that
Mr. Kudryn had with the actual supplier of the sofa
itself. You can envision a situation where Mr. Kudryn
bought these sofas wholesale in the United States from
somebody else -- and this did in fact occur at times
during the Apple scheme where Mr. Kudryn would buy gray
market Apple products or promotional Apple products from
somebody in the United States and then resell them.

And other times he would buy Apple products
from outside the United States, and that's where I think
that distinction would come into play.

Here we're in a unique position to know that
all of these sofa sets that are at issue in the count of

conviction, in the wire fraud conspiracy relating to the

sofa sales, all of those originated from outside the

United States.

THE COURT:  Thank you.  Briefly, anything

further on this topic?

MR. WELLS:  Judge, I would just say there is

nothing fraudulent or illegal or untoward about the

manufacturer of the sofa sets.  And so what was -- what

made this conduct illegal was what was said in the

United States.  And so because of that, I think that

that's what should drive that.

And as far as the loss amount, I guess let's

say I sell Corvettes and somebody comes in and the

Corvette is there for $65,000, and I say, "You know

what, if you get this Corvette, and I'd say this to some

middle-aged attorney, sorry, and I say, "If you get this

Corvette, you will be irresistible to women," and the

guy says, "Okay," and he buys the Corvette for $65,000.

All right.  What's the intended loss?

The guy is not pocketing any money in terms of

he sold it for more than the price should be.  Okay.

What he's done is he has told the guy something to get

him to do that.  So he's bought a Corvette.  He's bought

a Corvette for the manufacturer's suggested retail

price.  So you could say he hasn't been defrauded of any

1 money.  He's been induced into the transaction

2 fraudulently.

3          That's why I say it's different, because what

4 we're talking about here is not statements about him

5 trying to persuade somebody to buy something at a price

6 that will defraud them in a sense that they are paying

7 too much for what they are getting.  What he's doing and

8 what he's agreed to is he's made false statements to get

9 somebody to agree to the transaction.

10          And so that's why I say that it's a weird

11 situation where there is not an intended loss, because

12 if there was an intended loss, he's going to be jacking

13 the price way up and talking about all kinds of

14 different things.  His whole point was cover the

15 shipping expenses.

16          And so I know it's a weird -- I know it's a

17 weird case, but it's a weird case, I guess.

18          THE COURT:  Well, there you go.  All right.

19 Thank you.

20          On these guideline issues, I have given it

21 considerable thought, and I appreciate the parties'

22 arguments.  I tried to find case law, and I'm sure the

23 parties did too, but without success.

24          I do see that the determination of the amount

25 of loss here cannot reasonably be determined as to what

1   the loss was in buying this product as a Chinese

2   manufactured couch or set versus Italian manufactured in

3   the consumer's eyes, and since that loss can't

4   reasonably be determined under the methods that are

5   suggested in application note 3(C), I do find that gain

6   should be used that resulted from the offense as an

7   alternative measure in this unique case.

8          And in looking at what is the gain that

9   resulted, I have some difficulty with the math that is

10  advanced by the defense insofar as, if I understand it

11  correctly, it would -- these containers had a bunch of

12  iPads in them and furniture, and as I understand the

13  defense math, it would put all of the shipping costs on

14  the furniture, when in point of fact it was getting

15  those iPads across the ocean that was the real money

16  making issue going on.

17         I have considered the fact that that is part of

18  the facts before the Court that were agreed upon in

19  looking at the loss associated with the furniture.  So I

20  don't see saying that furniture is the driver of the

21  cost of shipment as reasonable.

22         So what I have done is I have looked at the

23  $1,050 that the parties agreed in the plea agreement was

24  Mr. Kudryn's cost for this furniture, and I have

25  somewhat -- looking at the $2,400 -- or $2,300 to $2,400

sales price that was charged for these, and saying that
certainly some of the cost of the shipping should be
ascribed to the furniture, I do see that a minimum of
$250,000 to constitute the gain that was received as a
result of these transactions to be a calculation that is
supported by clear and convincing evidence given the
totality of the evidence in the presentence report and
as derived from the plea agreement and the search
warrant affidavit.  So I do find that that offense
characteristic enhancement is warranted.

On the topic of the number of victims, I do
see, and I look to the plea agreement, that Mr. Kudryn
admitted guilt to having made fraudulent statements, had
a scheme to defraud for the purposes of obtaining money
by false or fraudulent purposes, and that was the basis
for the plea agreement.

And even if there are individuals that at this
point feel that they are not -- they are happy with
their furniture purchase, there was clearly an intent to
use the electronic means to try to talk people into
buying furniture that was something other than what it
was purported to be and to state that the value of the
furniture was considerably more than the asking price.

So I do see in that context that the plea
agreement makes it clear that there were victims that

clearly exceeded ten in number that were the individuals
that were impacted by this scheme. And I think -- I
read, and I thought it was interesting, that individuals
on Craigslist sadly felt like, hey, if you're buying
something on Craigslist you can expect to get taken, and
that's why we have laws is to try to prevent that from
being the way that we engage in commerce in this day and
age with the internet out there for buying and selling
in that manner.

So in any event, I do see that there were ten
or more victims. That I would see by the preponderance
of the evidence standard would apply, because it's only
a two-level increase. And so the fact that the
Government hasn't brought forth ten people saying that
they felt that they were victims does not impact the
Court's determination that in point of fact there
clearly were ten or more victims of this particular
offense.

On the "was a substantial part of the
fraudulent scheme committed outside of the United
States," I also agree with the Government that that
enhancement is warranted because the use of the Duo
person or entity to purchase the furniture in China was
what made the whole scheme workable. Without the
Chinese furniture, there would have not been any wire

fraud that occurred with regard to that furniture, and
so taking that together with the component of the
affidavit that was agreed upon by the parties insofar as
it made it clear that the filling of the container to
cross the ocean was a key part that motivated this
particular crime with the Chinese furniture, I do see
that a substantial part of the fraudulent scheme was
committed outside the United States, albeit, there was a
substantial part also committed in the United States
insofar as the Craigslist was directed at Alaskan
consumers by and large.

So I do find overall then that the guideline as
calculated by the probation officer, with the exception
of paragraph 47, which we previously discussed, is an
appropriate guideline determination and I will adopt
that, which would be a resultant offense level of 20,
and a criminal history category of I. And that results
in a guideline range of 33 to 41 months; a term of
supervised release of 1 to 3 years; the fine would be
the same as previously recommended, $15,000 to $150,000
under the guidelines; and the restitution we can address
in the course of the parties' remarks, together with the
mandatory special assessment.

Any questions or clarification regarding the
Court's ruling on the guidelines, Mr. Alexander?

```
1              MR. ALEXANDER:  No, Your Honor.
2              THE COURT:  Mr. Wells, questions or
3    clarification?
4              MR. WELLS:  I guess -- no, Your Honor.
5              THE COURT:  I mean, I will readily acknowledge
6    a unique set of facts, but I endeavor to apply the
7    guidelines as best I could to that set.
8              So, Mr. Alexander, why don't I hear your
9    remarks under 3553(a).
10             MR. ALEXANDER:  Yes, Your Honor.  I do want to
11   point out, just in case anybody does want to make a
12   statement, that there are several, or I believe to be
13   several victims.
14             THE COURT:  Why don't we do that next then.
15   That's fine.
16             MR. ALEXANDER:  If that's okay with the Court.
17             THE COURT:  That's fine.  That's fine.
18             Good afternoon.  If you can come forward.
19   There is a microphone right there.  State your name.
20   I'm glad the lawyer spoke up that you wanted to come
21   here and speak today.  So go right ahead.
22             MR. KLAWITTER:  I'm happy to be here, Your
23   Honor.  My name is Mike Klawitter.  I live in Palmer,
24   Alaska.  And I purchased furniture from Mr. Kudryn
25   there, a couch set, a loveseat set and an individual
```

```
 1    chair set.  And it was advertised on Craigslist and was
 2    described in person by him that this was high quality
 3    Italian leather furniture and apparently -- it's not
 4    leather to begin with, so the product wasn't even
 5    accurate in description.
 6            THE COURT:  What was it, in your understanding?
 7            MR. KLAWITTER:  Well, it was described and sold
 8    as leather furniture, but it's really some kind of fake
 9    vinyl surfacing on it.  It wasn't even actual leather.
10    It was kind of funny, because I flipped the furniture
11    over and looked for any identification tags from
12    manufacturer, country of origin on any of the cushions
13    or any of the furniture themselves, and there was none.
14            So whatever identification tags that came with
15    that furniture, my guess is they were removed or not put
16    in place to begin with.  I'm not sure.
17            Mr. Kudryn actually gave me at time of purchase
18    a little vial of cream to apply to leather to help
19    condition it and keep it clean.  So I mean it was a
20    pretty good ploy describing the leather furniture.  The
21    quality was poor.  And then I paid over hundreds of
22    dollars for a broken arm that broke off.  I have got a
23    secondary piece of furniture that's got the same
24    problem, and it's going to require several hundred
25    dollars if I opt to do that to fix it by a furniture
```

1   fix-it place.

2          That was a complete nightmare.  I felt

3   defrauded by him on what he was selling.  And I would

4   recommend maximum sentencing as you see in the

5   guidelines there just from my experience.  I appreciate

6   the opportunity.

7          THE COURT:  I appreciate your comments, sir.

8          Mr. Alexander, go ahead, please.

9          MR. ALEXANDER:  Thank you, Your Honor.

10         The Court has heard extensive argument and a

11  number of hearings, or has presided over a number of

12  hearings in this matter and has had the benefit of a

13  very thorough and detailed presentence report, so I'm

14  not going to further belabor the facts.

15         I do think, as we considered on our end what an

16  appropriate recommendation would be, that this does

17  present a difficult situation for the Court.  Like most

18  of the individuals who are criminal defendants who

19  appear before Your Honor, Mr. Kudryn -- nobody is making

20  the argument that Mr. Kudryn is a bad person.  That's

21  obviously not a consideration before the Court.

22         But weighing against that, and the fact that

23  Mr. Kudryn obviously has the support of his family who

24  are here today, weighing against that I think that it's

25  clear from the record that Mr. Kudryn has used his

charisma, his position in the community, his obvious
business acumen, which if it's directed to a law abiding
way can no doubt be successful, but he used all of those
-- his natural talent, skills and aptitudes for the
purpose of kind of skirting the line and engaging in
criminal activity for the purposes of defrauding
individuals for his own profit, a profit that ultimately
ended up benefiting his family as well.

　　　　　And so it's not unusual, particularly for
so-called white collar defendants to present to the
Court as particularly sympathetic in the way that other
types of criminal defendants don't necessarily have that
benefit when they appear before Your Honor.

　　　　　And so I don't pretend to have an answer of how
many months of incarceration it will take to address the
3553(a) factors to deter Mr. Kudryn from continuing to
engage in this type of criminal activity, which
apparently has an irresistible appeal to him, given the
long running course of conduct that's before the Court
today, primarily obviously in discussion of the sofa
scheme, to a lesser extent it's appropriate for the
Court to consider as well the interrelationship between
the sofa scheme and the Apple scheme, particularly since
there is that stipulated forfeiture of over half a
million dollars of proceeds from the Apple scheme as

1   well.

2        I think the core of the argument here today

3   before Your Honor is that binary distinction between

4   Mr. Wells' recommendation for a probationary sentence

5   with no period of incarceration and the recommendation

6   of the United States Probation, which has been joined by

7   the United States, of still a below guideline sentence,

8   but a sentence that does contemplate some period of

9   incarceration.  That's I think --

10        THE COURT:  So you recommended 12 months, and I

11   assume no objection to 12 months and a day?

12        MR. ALEXANDER:  That's correct, Your Honor.

13        THE COURT:  Which gives good time credit.

14        MR. ALEXANDER:  Yes.

15        THE COURT:  All right.  Thank you.  I

16   appreciate your comments, Mr. Alexander.

17        Mr. Wells, go ahead, please.

18        MR. WELLS:  Judge, I sit here and -- I stand by

19   my recommendation.  Okay.  I look at this and I say, you

20   know, this is ultimately a consumer protection issue.

21   If we were in -- I am not licensed in Tennessee anymore,

22   but I am licensed in Washington, licensed in California,

23   and I was licensed in Tennessee, and they have a

24   consumer protection division that would normally handle

25   this as a civil matter.

1          And this wound up here over disputes about
2     furniture.  And I look at this, the Court's made a
3     ruling in terms of the gains, but, again, I think that
4     if one looks at the cost, if there is -- if there is
5     roughly -- first of all, I think that there is disputes
6     in this case about how effective those ads were, and the
7     presentence report says look at all of these ads, there
8     must be --

9          THE COURT:  I understood your argument there
10    about resetting the ad.

11         MR. WELLS:  Right.  And particularly when one
12    looks at the expenses, I think that then pushes those
13    numbers down.  And even if the Court halves and says,
14    okay, half of the cost of shipping goes to the
15    merchandise and half goes to the furniture, that then
16    means that approximately out of, what, off the top of my
17    head, a couple hundred sales, you got $800, with a
18    couple hundred sales of $800 profit, then you're looking
19    at that point at about $160,000, I think, instead of
20    $250,000 for the guideline loss.

21         And so I think in this case, Judge, you know,
22    with the exception of the Valley dairy case, all the
23    fraud cases that I have been in front of this Court
24    before generally involve two commas, if not more.  And
25    here we have, I think, a small situation, and I'm

1    thinking what good does imprisonment do.  Is

2    imprisonment going to give people back their money?  I

3    think that's far more important.  We have got a

4    restitution issue.

5          Is imprisonment going to deter other people?  I

6    think that we're -- this is one of those cases that's on

7    the line in terms of what was said, but, again, there is

8    -- how much, Judge?  There is that line between caveat,

9    and fraud, between puffery and fraud, and where does

10   that line exist?  And that's a hard thing to say.

11         We have agreed that we have crossed that line

12   into fraud, but I don't think we have crossed that line

13   into the fraud very far, if that makes sense.  In other

14   words, if this case had gone to trial, I think that I

15   could have looked at a jury with a straight face and

16   said this was puffery, and it means to inducement.

17         We obviously did not choose to go to trial.

18   Mr. Kudryn has pled guilty.  He's accepted his

19   responsibility.  We're not trying to avoid that.  But I

20   stop and say, okay, the Government talks about the iPad,

21   and even the Government agrees the iPad situations were

22   gray market.  What is significant I think about that is

23   Mr. Kudryn withdrew from that several years ago, so all

24   the iPad conduct he voluntarily stopped.

25         And there has been nothing about his current

business that's at all an issue.  There has been no
allegations of any sort of fraud or problems or anything
like that.  And even in this case, as I have
demonstrated, we have a number of people that purchased
the furniture and they are quite happy with it.

So how do you balance -- how do you balance
that?  I can guarantee you that if Mr. Kudryn had been
selling leather furniture and nobody had gotten leather
furniture, we would have had a whole lot more people in
this courtroom saying, "You know what," and they would
be going, "I spent $2,500 and I got nothing."

And so because of that, I think given these
unusual circumstances, I don't think prison is
necessary.  I think some of that comes under the initial
one of the circumstances of the case and the history of
the offender.

The need to deter, first of all, I think that,
as I said, Mr. Kudryn has self-deterrence.  He stopped
the iPad situation.  Secondly, I think that he's learned
from this.  He's been on pretrial services.  He's done
really well on pretrial services.  A number of courts
have recognized that as a really good indication.  He's
been on pretrial services since August or September of
last year.  He's been on pretrial services for roughly a
year and he's not had a problem.

           Part of it was they agreed he could leave the
country and go to trade shows and come back.  He has.
He has not ever fled the country.  He's not ever said,
"You know what, I'm gone."  He certainly has family, a
number of whom are here.  That itself is unusual.  This
Court knows probably 19 times out of 20 that when I'm
sitting here talking about my clients there is nobody
back there.  And he's got good family.

           He's got a good work history.  He's got a good
company.  He's got a company that's in Alaska that
employs Alaskans and that brings money into Alaska.  I
think frankly, Judge, the consequences of being on
supervised release, I think the consequences of being a
felon and I think a fine are more than enough to satisfy
the 3553(a) factors.

           And that's what I would encourage the Court in
this case, because of this case.  Again, I think the
argument would be different if he was selling furniture
and just taking people's money.  In that case, okay, I
can see that.  But in this case, we got some people that
are unhappy, we got some people that are happy.  At the
end of the day, everybody got leather furniture.  The
Government hasn't said that there was anybody that came
in, paid the money and didn't get what they said.

           So because of that, I think it is a much

different case, and I don't think that imprisonment is

necessary.

THE COURT:  Thank you, Mr. Wells.

Mr. Kudryn, you have the opportunity to address

the Court.  I would certainly be interested in anything

you wanted to say.  If there is nothing, that's fine

too.  You can stay right there.

THE DEFENDANT:  Hello, Your Honor.  I have had

very little to say during this process that has spanned

more than one year.  I'm thankful that this right has

been made available to me.

I'm going to jump right into things without

wasting any time by stating a few points on my history.

I am the oldest of 12 children, which I am honored for

all of them to be here today except one.  I am

overwhelmed to see everyone arriving from California,

Hawaii, Alaska, and even Germany.

I'm privileged to see my beautiful mother

sitting in the audience.  Thank you, Mom, for coming.  I

love you a lot.

I'm so happy to see my youngest sibling,

Violet.  Thank you, sis.  I'm so happy you flew up to

attend.

My beautiful wife of 14 years and four children

are also here.  Thank you for courage, strength and

1   unwaivering support you have provided over the past

2   year.

3           I was born in 1985 in the former USSR, now

4   known as Ukraine.  In '89, my father and mother legally

5   immigrated to the United States to become the first

6   Ukrainian immigrants to Walla Walla, Washington.  I am

7   so thankful to America for extending this amazing

8   invitation more than 30 years ago.

9           I grew up in eastern Washington for ten years

10  of my life, and sometimes think what my life would be

11  like had my parents not immigrated to the USA.  I

12  attended Liberty Christian School through the eighth

13  grade before the family moved to Alaska in 1999.

14          I homeschooled over my high school years, which

15  allowed me to work side jobs and fund my passions in

16  aviation.  I graduated a year later and finished my

17  aviation training and became the youngest airline pilot

18  flying for a local company here in Anchorage.  My

19  airline career spanned a period of seven years, which my

20  ambitions allowed me to hold the youngest hired pilot by

21  two independent airlines, which included flying a jet

22  for Continental Airlines Express at the age of 19.

23          My wife and I married in 2005 at the young age

24  of 20, and life took off from that point forward.  While

25  flying in the airlines my entrepreneurial spirit awoke,

1    and I began experimenting in business to identify what
2    else I may have skills in.  I have always loved sales.
3    I have had the gift of identifying problems and creating
4    solutions for them.  This quickly sprung me forward in
5    my entrepreneurial adventures.

6         Fast-forward to 2010.  I no longer was able to
7    run my business and fly passengers for a living at the
8    same time.  I had to pick one and decided to let my
9    entrepreneurial passions take lead.

10        I'm the president of a company called Crave.
11   Crave manufactures electronic devices and accessories
12   for your daily devices.  To name a few, we manufacture
13   products such as mobile phone cases, portable battery
14   chargers, speakers, ear phones, cables, glass protectors
15   and several others.

16        I started the business with my brother, which
17   was a result of the experience gained in distributing
18   many different products in my early twenties.  The
19   experience gained working with many different products
20   helped me identify areas that were not addressed by the
21   market.

22        As a result, Crave started to manufacture our
23   own products.  By providing solutions to many areas that
24   are ignored in the industry, we have built a highly
25   reputable brand that at this time operates across the

U.S., Canada, and ten other countries. We are highly
demanded for a few reasons. We provide the American
standard and experience with meticulous attention to
details in a space occupied by foreign companies of
mostly one country who rarely deliver what the western
consumers appreciate in our daily products.

We have exceeded more than one million
customers in Crave and are quickly approaching the two
million mark. One of the greatest areas I am proud of
is our products accounts list, which includes my own
Government. It is very ironic, but this does include
the Department of Justice, which I am standing in at
this moment; the United States Marshal Service, behind
that door; the United States Federal Deposit Insurance
Corporation; the Department of Transportation; state
governments; school districts; and list goes on,
covering many governmental agencies, business entities,
and, of course, a huge amount of independent users.

One very important principle I have been taught
by my late father was to always do the right thing. I
hold dear the life principles he thought me, which are
faith, family and country, in that order.

We were one of those families that prayed grace
over every meal and lived our lives closely connected to
our faith. My father is my best example of these

principles.  He was given the opportunity to immigrate
to the United States and worked hard to build the
American white-picket-fence life that America is so
famous for.  26 years of hard work, which included ten
years in Nelson Irrigation Corporation in Walla Walla,
Washington; 16 years in the City of Palmer at the Alaska
State Troopers facility.

With his dream retirement home built in Kona,
Hawaii, he was excited to move on into his golden years
and enjoy the fruits of his labor.  Sadly his life was
cut short one and a half months before his retirement at
the age of 57 by an intoxicated man of less than
sterling character who pulled out into the oncoming
traffic lane January 1, 2016.

Fast-forward, it's been three and a half years,
we as a family carry on that baton where my father left
off.  He would not expect anything less of us than to
pick up where he left off.

Just over a year ago, I was charged on a count
of wire fraud for the sales of sofas on Craigslist.  The
charge came to me highly unexpected.  I have always been
taught to respect authority and teach my children the
same thing.

The situation was highly challenging and
alarming.  It took some time to regain clarity of

thought and figure out what to do next.  Nonetheless, I
approached the issue with as much hands-on attitude as I
do any regular challenge in my entrepreneurial career.

I analyzed the issues presented to me and
strongly agreed that it is highly unacceptable to engage
in the conduct the Government presented.  In my business
we have a metric called feedback and customer reviews.
It is a very simple way to see how our business is run
and managed by reading what many thousands of customers
write.  This is publicly available information.

I must make note that I never considered
furniture a business of mine.  My day-to-day activity is
running my company.  Furniture was a means to fill a
void space in containers from the factory in China to
our U.S. warehouse.  The only reason I ever agreed to
engage in the hassle of bringing sofa sets was due to
the location we are based, Alaska.

It costs $2,000 to ship a container to Seattle,
yet more than $10,000 to Alaska.  There is no way to
cover that gap unless some sort of miscellaneous product
could be offered to the public that provided value
versus what could be bought in the local retailers.  I
identified areas where cost could be significantly
lowered by providing the consumers what consumers wanted
for much less.

The sofa sets I sold appraised at $3,199. Most will find that $2,300 is a bargain for a three-piece leather sofa set. Furniture was that niche product for me with just barely enough to demand to sell them between shipments.

With a couple of sales a month, it was possible to offset the highly inflated shipping costs of being based in Alaska. The sales would be quite sporadic without much rhyme or rhythm. My day-to-day activities are running my business, Crave.

Normally, a Craigslist ad would result in a call, e-mail or text asking to look at the set I had posted. I normally advise that they are in a spare room of my office and I am in the office from 8:00 until the end of the day, which oftentimes extended into the night. The caller would arrive through the day, which meant me breaking up daily responsibilities, running to the spare office to show the set.

Oftentimes, I would be in the middle of a transaction with a customer selling Crave products, on calls with factories, laboratory distributors, buyers, agents, et cetera. I put them on hold, run next door, answer the questions presented. The party would touch, feel and sit on the set to make their decision.

The Government charge cites several bullet

points that brought me great concern.  They required a
hands-on approach to address them.  Up to that point I
never received a single complaint in nearly five years
of sofa sales.  I didn't really know how to address the
Government's charge when buyers appeared to be happy,
with some coming back to buy multiple units.

With more than 1 million products sold by my
business, if there is ever a problem, customers are very
vocal in this digital age and we resolve them to the
customer's satisfaction as quickly as possible.  Keeping
customers happy is a very basic principle of succeeding
in business.  This is why they come back to buy from us
over and over.

The best way I could deal with the issue was to
locate the people who made purchases of the sofa sets
and ask them what I told them and what was their
experience.  This was an immense challenge for me
because I did not have the names, phone numbers of
buyers.  I simply did not consider it important to save
this information considering the sale was via classified
ad on Craigslist.

To me, this was no different than selling
something at a yard sale, never remembering the name of
the buyer.  Not saving customer names and numbers was a
tremendous mistake.  It took months to pull data from

phones and phone logs dating as far back as I could get my hands on. My cell phone was seized and not returned until September 2018.

Of approximately 100 to 110 sales I made over five years, I could locate only 17 people. I met with every single one of them to ask whether or not they experienced the bullet points in the charge. Several people stated they lacked clarity on several points, such as the Italian leather point. To some this meant made in Italy instead of what it meant to me, the leather material being Italian leather.

Some stated they didn't fully understand nor cared what it was made of. Most stated the deal was simply too good to pass up compared to local retailers, which almost everyone had compared to. The product was presented in person and each person assessed if the furniture was what they wanted.

Out of 17 people I could locate, 13 of them gave me affidavits voicing their satisfaction. One party stated they did not feel comfortable writing an affidavit due to the Government press release casting doubt if the set was made in Italy versus Italian leather. One party stated they had no time and asked me to pay them to write an affidavit, which I stated would not be possible. One party shared one of their personal

life stories with me involving their own challenges that
left them no desire to participate in any affidavit.
This particular party made multiple purchases, a total
of three sets from me, and are immensely happy with me.

One party went through a detailed interview
with me voicing their satisfaction of the set purchased,
drafted an affidavit; yet upon me sharing my love of
America, my entrepreneurial passions, quickly decided
they were no longer interested in providing an affidavit
on political grounds.

Your Honor, this brought me to several
conclusions.  I'm almost done here.  In hindsight, I
should have listened to questions more attentively and
provided clearer answers.  My answers left some
believing the furniture was made in Italy versus made
using Italian leather material.

My statement on shipping made some believe the
goods shipped from the Lower 48 instead of from China
via the Lower 48.

My goods valuation of $4,800 per set also known
as retail pricing, MSRP, or original price, was
translated as defrauding Alaskans.  The appraisal
completed in the summer of '18 required obtaining
quotations from the local furniture stores.  A quote
from Sadler's Furniture showed an original price of

$3,979, which is discounted down to $2,279. Another set priced using original price of $7,477 was discounted to $4,079. This pricing model is standard practice in the retail industry, not limited to just furniture. The same model is found in car sales, equipment sales, phone sales and many other segments.

Finally, the statement of why I owned the furniture versus my comment stating they were extras or seconds, I should have stated that I purchased the furniture to offset shipping costs to my business merchandise. Unfortunately, I didn't know that was valuable information to the consumer.

I'm thankful to the 17 people who had taken time to speak in great detail and answer questions about this matter. Every business that I operate 100 percent depends on satisfied customers. This has been the part that wrecks me to this day. Even one customer who is unsatisfied with any of my products keeps me up at night. I go to incredible lengths to under-promise and over-deliver in every area of my businesses.

Sadly, I did not provide attention to detail in these furniture Craigslist sales, and, in hindsight, would have avoided this mess had I paid attention, didn't multitask, and, as a result, answered questions accurately.

1          I understand per the Government's sentencing

2     report there are several people who are unhappy with

3     their purchase.  I am sincerely sorry for the misleading

4     information.  What taking responsibility in this case

5     means to me is not just a sincere apology, but

6     reimbursing you for the inaccurate statements I made.

7          If you are present here today, I am terribly

8     sorry for providing you inaccurate information.  There

9     is no excuse for that, and I'm more than happy to refund

10    the $500 at any time.  Please see me at your convenience

11    to collect the funds.

12         Assuming the Government buyer is one of the

13    several listed people, I am happy to reimburse you the

14    full $2,300 for your purchase if you would like to

15    return the set you bought while filming me.

16         Your Honor, Mr. Alexander, thank you for

17    returning my travel privileges last September, removing

18    me from the GPS monitor and many flexibilities provided

19    in allowing me to run my businesses while dealing with

20    this difficult situation.

21         It has been a highly troublesome year.  I don't

22    say these words lightly.  Thank you.

23         Having read the sentencing reports leaves me in

24    a troubled state of mind.  The overwhelming majority of

25    the reports focus on areas that are outside the charge

made against me. Those areas have no connection with furniture. It doesn't require many words to describe the actual charge against me and why I'm standing here today.

Very little effort was put forth to present accurate data regarding quantities of furniture sold, their true value, quantity of customers, and, most importantly, attributing the loss amount on furniture using gross revenue numbers. Very little effort is required to visit a local furniture store to identify furniture pricing.

By visiting the local furniture store, it becomes abundantly clear that my furniture was sold below market value causing no loss. This furniture was appraised at $3,199 per set. I sold them at $2,300 per set, which leaves a $900 value gained to the buyer.

I have learned a tremendous amount from this case. Buying and selling products is a privilege in this country that cannot be taken lightly no matter what avenue the sales take place on. A Craigslist sale requires the same attention to detail that a business requires. It make no difference how small or how good of a deal it may be.

I clearly am unable to perform well when my attention is spread over multiple directions at one

1  given time.  This is obvious by the folks unhappy with

2  their purchases.  Again, my sincere apologies for this.

3          The life truth that says you can't be old and

4  wise about being young and stupid has a very defining

5  meaning to me.  I believe I have graduated out of the

6  young and stupid phase in my life and looking forward to

7  the old and wise ahead.

8          While this case casts a tremendous shadow on my

9  life that I have to live with, I hope to overcome and

10  use my experience to bring attention to fellow

11  entrepreneurs of matters easily missed that bring

12  immense challenges that never go into the

13  entrepreneurial risk formula many of us have before

14  launching a small business.

15          My world view has fundamentally changed by this

16  case.  I hope those hurt can recover quickly and that my

17  sincere apology is accepted.

18          Thank you.

19          THE COURT:  Thank you.  I'm going to take about

20  ten minutes here, organize my thoughts, and then we'll

21  be back on record.  We'll go off record briefly.

22          DEPUTY CLERK:  All rise.  This court stands in

23  recess for ten minutes.

24          (Recessed from 4:51 p.m. to 5:02 p.m.)

25          DEPUTY CLERK:  All rise.  Her Honor, the Court,

1    the United States District Court is again in session.

2            THE COURT:  Please be seated, everyone.

3            In determining a sentence, a Court is to impose

4    a sentence that's sufficient but not greater than

5    necessary to meet each of the purposes set out in

6    federal law.

7            And I have looked first at the nature and

8    circumstances of this offense.  And as set out in the

9    plea agreement, Mr. Kudryn acknowledged his

10   responsibility for the fraudulent conduct with regard to

11   the furniture.  And I understood his perspective that

12   perhaps the furniture wasn't -- it was worth more than

13   the $2,400 it was sold at, and, hence, although I

14   clearly heard Mr. Kudryn acknowledge he made statements

15   that were not accurate, that viewed in isolation, this

16   furniture series of transactions, if I were looking at

17   that in isolation in terms of the nature of the offense,

18   it is not as serious as other types of mail fraud that

19   has divested people of lots of money and/or goods that

20   has come before the Court.

21           And yet I can't, based on the record here, look

22   at this series of sofa transactions in isolation.  And

23   as part of the plea agreement, there was an application

24   for a warrant that the parties, Mr. Kudryn, acknowledged

25   the truth of the statements in there too.  And it's

1  clear that from looking at that 38-page document that

2  these furniture fraud transactions is not a single

3  incident in Mr. Kudryn's business career.

4        As detailed in the presentence report -- I'm

5  sorry, in the search warrant that the parties have

6  agreed to there was in Mr. Kudryn's background back in

7  2010 the $300,000 in damages he paid to Monster with

8  regard to the Dr. Dre headphones.

9        And as Mr. Wells pointed out, many of these

10  types of fraud cases are false and misleading

11  advertising and are I believe appropriately addressed

12  through civil enforcement proceedings, but that clearly

13  did not result in Mr. Kudryn abstaining or giving up

14  this type of fraudulent conduct in future transactions.

15        MR. WELLS:  Judge, I believe that's $30,000,

16  not $300,000.

17        THE COURT:  Paragraph nine of Docket 66-1, page

18  five states $300,000 in damages, so that is what I would

19  be relying on.

20        MR. WELLS:  Very well.

21        THE COURT:  If there is a motion to correct

22  that in the record, that can be made.  I'm reading

23  paragraph nine, Docket 66-1, page five, which states

24  that Dmitry Kudryn and Wireovia from trade in Monster

25  Products were ordered by the U.S. Central District of

1  California to pay $300,000 in damages to Monster.

2          And I have likewise looked at the conduct where

3  Mr. Kudryn then purchased fake Chinese national

4  identification cards through business contacts and used

5  those fake identifications to set up ten or more Amazon

6  seller accounts throughout several European countries.

7  And there again, Mr. Kudryn has acknowledged that that

8  was conduct that he has engaged in.

9          There was also Monster, it indicates in 2011,

10  perhaps this was what you were referring to on page six

11  of Docket 66-1, Mr. Kudryn was sued again by Monster for

12  selling counterfeit Beats by Dr. Dre, headphone sets,

13  and settled for $50,000 U.S. dollars, so that's also in

14  the search warrant affidavit that the Court has relied

15  on.

16          Like I say, I'm not looking at this particular

17  conduct here, which is before the Court, for sentencing,

18  in isolation.  And certainly while it's very commendable

19  that Mr. Kudryn has a criminal history of zero points,

20  no criminal history involvement in the past, there is

21  clearly a history of fraudulent misconduct in connection

22  with business dealings in his history.

23          I have considered the need for a sentence to

24  reflect the seriousness of the offense, promote respect

25  for the law and provide just punishment for the offense.

And I do see that, and many people have written about
this, that people that are selling small amounts of
drugs, and certainly both counsel have been in court
with me, $2,000 to $5,000 and five-year mandatory
minimum is what Congress says, and here we have a large
scale fraud being perpetrated and we're not looking at a
mandatory minimum, but to indicate that incarceration is
not warranted given the history of fraudulent conduct in
the business dealings of Mr. Kudryn, in this Court's
view, would not be meeting the obligation of the Court
to provide just punishment for this type of offense.

I have considered the need to deter others, and
certainly I do see that a factor here that is perhaps
more likely to accord general deterrence in what is
called white collar crime as opposed to people that are
addicted committing crimes or bank robberies without
really acting on any kind of planning.  Here there was
several years of planning and activity by Mr. Kudryn in
engaging in this conduct.

I do see that there is a need to protect the
public from further crimes of the defendant.  I didn't
really hear from Mr. Kudryn today how he plans to go
forward to ensure that his conduct remains within the
confines of the law.  And clearly Mr. Kudryn is a very
successful business person and a person that can be of

great benefit to our society, but the Court is concerned as to the need to protect the public from further fraudulent activity by Mr. Kudryn, although I certainly heard what appeared to be a heartfelt apology to the individuals that were victims of this particular crime.

It's not a factor in this case for educational or vocational training, which is sometimes an important consideration. I have considered the guidelines here. And in looking at the guidelines, which no party is here, or probation as well, is not advocating for, and I do see that that is warranted, that a guideline calculation is not appropriate in the case. And in part that relates to this complication with the intended loss that it was -- in the Court's view, the guidelines didn't really fit the nature of this case, so I have not relied on the guidelines here in determining an appropriate sentence other than to make that initial guideline computation.

There is a need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. I know when I had cases involving people that cheated on their tobacco taxes and the Government came in and said everybody that was involved in this $2 million scheme, and some only a couple hundred thousand, should get

probation and walk.  And I said that is wrong.  That is

wrong as a society that we say that you can steal on

paper and not in a violent way, you can steal and then

just get a slap on the hand, recognizing a felony

conviction is not a slap, it's a serious imposition, but

I did impose sentences of imprisonment in that case.

And in the Court's view this is a similar,

albeit different set of facts, but does warrant that

there be a term of imprisonment imposed.

It is for those reasons that, pursuant to the

factors that are set out in 18 U.S.C. 3553(a), it is the

judgment of the Court that the defendant, Dmitry Kudryn,

is hereby committed to the custody of the Bureau of

Prisons to be imprisoned for a term of 12 months and

1 day.  The reason I am doing the extra day above the

recommendation of both probation and the Government is

so as to accord Mr. Kudryn an opportunity to serve in

fact less time because the good time credit accrues only

when a sentence is over 12 months.

Upon release from imprisonment, the defendant

will be placed on supervised release for a term of three

years.  Within 72 hours of release from custody of the

Bureau of Prisons, the defendant shall report in person

to the probation office in the district to which the

defendant is released.  While on supervised release, the

```
 1  defendant shall not commit another federal, state or
 2  local crime, shall not possess a firearm or illegal
 3  controlled substance, and shall comply with the
 4  collection of a DNA sample and the standard and special
 5  conditions to be included in the Court's judgment.
 6          And there were five proposed conditions by
 7  probation at Docket 80 at pages three through four.
 8  Mr. Alexander, any changes that you would propose?
 9          MR. ALEXANDER:  Your Honor, if I may have one
10  moment.
11          THE COURT:  Certainly.  It's Docket 80 at three
12  through four.
13          MR. ALEXANDER:  I'm sorry, Your Honor.  Three
14  through four on mine is the charge and conviction.
15          THE COURT:  I'm looking at Docket 80, which is
16  the sentencing recommendation.
17          MR. ALEXANDER:  Thank you, Your Honor.
18          THE COURT:  I may have misspoken, but Docket 80
19  pages three through four.
20          MR. ALEXANDER:  Your Honor, I'm just taking a
21  moment to share with Special Agent Wight, the case
22  agent.
23          THE COURT:  Sure, go ahead.
24          MR. ALEXANDER:  Thank you, Your Honor.  No
25  corrections.
```

1    THE COURT:  Mr. Wells, any changes you would

2 propose to those five conditions?

3    MR. WELLS:  No, Your Honor.  I'm trying to

4 think of a fraud case or a case like this that has not

5 included those.

6    THE COURT:  Those are pretty standard.

7    MR. WELLS:  In these types of cases, they are

8 pretty standard so I don't have any legal grounds to

9 object.

10    THE COURT:  I will suspend the drug testing

11 requirement based on the recommendation of the probation

12 officer because I do find a low risk of future substance

13 abuse.

14    I do find that Mr. Kudryn has the ability to

15 pay a fine.  A fine of $150,000, which is the high end

16 of the guidelines, was recommended by the probation

17 officer.  The Court will impose a fine of $100,000.  The

18 reason I'm doing less is because I considered, first of

19 all, Mr. Kudryn's willingness to do restitution.  There

20 will be the restitution that will be ordered here.

21    There is the forfeiture that occurred as part

22 of the plea agreement in the case, and also the

23 magnitude of the offense based on the Court's intended

24 loss finding warrants a fine in that amount.

25    I do find the restitution that will be as

1   requested in the presentence report for the three

2   individuals listed there.  There was reference to

3   additional, I believe, at this point.

4          MR. ALEXANDER:  Your Honor, there are five

5   total who have made a request.

6          THE COURT:  So if you could provide that

7   information to the courtroom deputy.  And then likewise

8   there is the mandatory special assessment.  And that

9   will be the Court's order.

10          And anything further before I address appeal

11   rights, Mr. Alexander?

12          MR. ALEXANDER:  No, Your Honor.

13          THE COURT:  There is a motion to dismiss, is

14   there not?

15          MR. ALEXANDER:  I think there is just the sole

16   count.

17          THE COURT:  All right.  And Mr. Wells, anything

18   further before I address --

19          MR. WELLS:  Yes, Judge, there are three

20   matters.  Number one, I talked to Mr. Jedrosko.

21   Probation is still in possession of an expired passport

22   of Mr. Kudryn's and they would like explicit permission

23   to return that to him.

24          MR. JEDROSKO:  Your Honor, I did talk to

25   defense counsel.  Given the Court's sentence imposed

 1    though, at this point, we would not want to return the

 2    passport.

 3            THE COURT:  That's fine.  And then voluntary

 4    surrender I do want to address.

 5            MR. WELLS:  I was going to ask for voluntary

 6    surrender.  I was going to ask if the Court could make a

 7    recommendation for Sheridan because I know they have a

 8    minimum security and it's the closest.

 9            Mr. Kudryn has been on some unique pretrial

10    release conditions that allowed him, with notification

11    to his probation officer, to travel outside the country

12    to attend trade shows for his business.

13            When he's going to be released, he will still

14    be working for his business.  I would ask if he could

15    still maintain that, particularly since he's done realy

16    well on pretrial release with that condition in place.

17            THE COURT:  Mr. Jedrosko, what's your

18    recommendation on that?

19            MR. JEDROSKO:  Your Honor, he has done very

20    well.  Given that he's now been sentenced to a term of

21    imprisonment, we would request that he turn over his

22    passport to us and his travel be restricted to Alaska

23    just out of an abundance of caution.

24            THE COURT:  Until going to Sheridan?

25            MR. JEDROSKO:  Yes, until such time as he

1    self-surrenders.

2           THE COURT:  The self-surrender would be at

3    Sheridan, I assume, not here.

4           MR. WELLS:  Right.  I should make plain, I'm

5    thinking of when he is released from custody and on

6    supervised release.

7           THE COURT:  On supervised release, able to

8    travel?

9           MR. JEDROSKO:  It's unusual, Your Honor.

10          THE COURT:  Let's do the following:  So the

11   request is for Sheridan, it's for voluntary surrender,

12   and it's for the ability to continue to travel.

13          MR. WELLS:  That would be while he's on

14   supervised release.

15          THE COURT:  Not for now?

16          MR. WELLS:  Not for now.  Typically, my

17   understanding with supervised release is that it takes

18   roughly three to six, three to eight weeks for them to

19   get everything done.

20          THE COURT:  To designate?

21          MR. WELLS:  I imagine that would happen fairly

22   quickly anyway.

23          THE COURT:  Mr. Alexander, what's the

24   Government's position on each of these topics?  No

25   objection to Sheridan I assume?

1          MR. ALEXANDER:  Of course not, Your Honor.  I

2    have no objection to self-surrender on the condition

3    that Mr. Jedrosko has described, which would be the

4    surrender of any passports that Mr. Kudryn has. I don't

5    believe that Mr. Kudryn currently has a passport for the

6    Ukraine.

7          THE COURT:  So surrender all passports by close

8    of business tomorrow.  Voluntary surrender.  What do you

9    recommend in terms of the timing, Mr. Jedrosko?  I can

10   do within one week of designation or --

11         MR. JEDROSKO:  Your Honor, if he

12   self-surrenders to the institution, Bureau of Prisons

13   will pick the date that works for them and then he'll

14   just have to surrender on the date that they pick.

15         THE COURT:  Self-surrender on the date

16   designated by BOP?

17         MR. JEDROSKO:  As notified by our office, yes,

18   Your Honor.

19         THE COURT:  Any objection to that approach?

20         MR. WELLS:  No, Your Honor.  That's been

21   typically -- it's either that or surrender to the

22   marshals here, so we appreciate being able to surrender

23   to Sheridan.

24         THE COURT:  So no travel outside Alaska at this

25   time.  With regard to supervised release, what I will

provide is no travel outside of the country unless
pre-approved by the probation officer, but I will say
here on the record today, and I can be reminded of it if
need be, that is that if Mr. Kudryn does satisfactorily
in custody, and I have every anticipation that he will,
that I would look favorably on a motion similar to what
was entered last fall to allow for the travel in the
event that the parties aren't able to agree, but I would
like to see the status of things at that time.

But I will say likely to be granted assuming
things remain in their current state as anticipated.

Anything further, Mr. Alexander?

MR. ALEXANDER:  Your Honor, only --

THE COURT:  There is the forfeiture.  You did a
preliminary order, so if you can submit a proposed final
order and we'll get that done.  I believe I saw a
preliminary one in the file a while back.

MR. ALEXANDER:  I believe so, Your Honor.  I
would just ask the Court order forfeited the 586,000 --

THE COURT:  I previously ordered it and I will
again enter a final order of forfeiture with regard to
the funds that were at the bank.  It's $586,000 and
what?

MR. ALEXANDER:  $748.22, Your Honor, seized in
matter 3:18-mj-364-DMS.

 1          THE COURT:  But the order of forfeiture that I

 2   did was in this case.

 3          MR. ALEXANDER:  I think that's right, Your

 4   Honor.

 5          MR. WELLS:  It incorporated it, right?

 6          MR. ALEXANDER:  The Court can criminally

 7   forfeit those funds that were seized.

 8          MR. WELLS:  It was part of the plea agreement.

 9   It incorporated by reference.

10          THE COURT:  The preliminary order was entered a

11   year ago in this case on August 29th, so, yes, final

12   order we can do here as well.

13          Mr. Kudryn, when you came to court and pled

14   guilty, you waived your right to appeal so long as the

15   sentence was within the range authorized by Congress,

16   which since the maximum sentence for this particular

17   crime is 20 years, is clearly within that range, so any

18   questions or concerns about that?

19          THE DEFENDANT:  No, no questions, Your Honor.

20          THE COURT:  Mr. Kudryn, I read a lot of

21   presentence reports, and this was a very long one.  And

22   I reflect often on the fact that, just as Mr. Alexander

23   said, nobody is saying that you're a bad person, and I

24   can only assume by the family support you have here and

25   what else is in the PSR that there is some very positive

 1    thing that you have done and I hope you continue down

 2    that path in the future.  Good luck in that regard.

 3              MR. ALEXANDER:  Mr. Kudryn pled guilty to Count

 4    1, which was the conspiracy to commit wire fraud, so the

 5    maximum, I was just about to pipe up anyway, would be

 6    five years, not the 20.

 7              THE COURT:  On Count 1.  All right.

 8              MR. ALEXANDER:  I apologize, Your Honor, Count

 9    2 is dismissed.

10              THE COURT:  Thank you, Madam Clerk.

11              DEPUTY CLERK:  All rise.  This court now stands

12    adjourned.

13              (Proceedings concluded at 5:23 p.m.)

14

15                        CERTIFICATE

16       I, Sonja L. Reeves, Federal Official Court Reporter
      in and for the United States District Court of the
17    District of Alaska, do hereby certify that the foregoing
      transcript is a true and accurate transcript from the
18    original stenographic record in the above-entitled
      matter and that the transcript page format is in
19    conformance with the regulations of the Judicial
      Conference of the United States.
20
         Dated this 28th day of October, 2019.
21

22                             /s/ Sonja L. Reeves
                               SONJA L. REEVES, RMR-CRR
23                             FEDERAL OFFICIAL COURT REPORTER

24

25